UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LARRY RAY SWEARINGEN, | } | |
| | } | |
| Petitioner, | } | |
| VS. | } | CIVIL ACTION NO. H-09-300 |
| | } | |
| RICK THALER, | } | |
| | } | |
| Respondent. | } | |

## MEMORANDUM AND ORDER

On December 8, 1998, Melissa Trotter disappeared after last being seen with Larry Ray Swearingen. The police arrested Swearingen on December 11, 1998, for charges unrelated to her disappearance. Swearingen has been in custody ever since. On January 2, 1999, hunters discovered Ms. Trotter's decomposing body in the Sam Houston National Forest. The State of Texas charged Swearingen with the capital murder of Ms. Trotter committed during the course of either a kidnapping or a sexual assault. A jury convicted Swearingen in 2000 and he received a death sentence.

Swearingen has aggressively challenged his conviction and sentence, including in one full round of federal habeas proceedings. Since his first state habeas action, Swearingen has advanced a variety of unsuccessful attempts to prove that he is actually innocent of Ms. Trotter's murder. State and federal courts have provided exceptional opportunities for Swearingen to develop his actual-innocence arguments. On January 26, 2009, the day before his scheduled execution, the Court of Appeals for the Fifth Circuit tentatively authorized Swearingen to file a successive federal habeas petition. *In re Swearingen*, 556 F.3d 344 (5th Cir. 2009). Swearingen now hopes to litigate claims

based on his argument that Ms. Trotter did not die until well after the police took him into custody on December 11, 1998.

Congress has limited this Court's jurisdiction at this stage of the proceedings solely to the question of whether the Anti-Terrorism and Effective Death Penalty Act allows Swearingen to litigate another federal habeas action.  As indicated below, the Court finds that Swearingen has not met the AEDPA's requirements for filing a successive petition.  Accordingly, the Court dismisses Swearingen's habeas petition.

**I.     Background**

Courts have previously set forth the facts surrounding Ms. Trotter's murder, but they bear repeating here because they provide important context to the issues now before this Court.  As previously noted, Melissa Trotter disappeared from the Montgomery County Community College campus on December 8, 1998.  No one saw her again until her body was discovered in a densely forested area on January 2, 1999.

The condition of Ms. Trotter's corpse when found has been a vital matter.  On January 3, 1999, Dr. Joye M. Carter, Chief Medical Examiner for Harris County, Texas, performed an autopsy on Ms. Trotter's body.  Dr. Carter described the corpse as "that of a young Caucasian female whose facial appearance was distorted due to decomposition change characterized by skin slipping, greenish-black discoloration of the facial skin, and marbling of the skin of the legs, arms, chest and back."  Dr. Carter described the body as "cool and damp."  The autopsy report pointed to several signs of decomposition on the corpse.  For instance, "[t]he skin of the body diffusely showed splotchy areas of red, green, and gray discoloration secondary to postmortem mold growth. There was generalized skin slippage with discoloration and marbling over the entire body surface."

Dr. Carter noted that several parts of Ms. Trotter's body – such as her chest, upper extremities, lower extremities, anal and vaginal orifices – were "remarkable only for decompositional change."  Dr. Carter's report emphasized the marked decomposition of Ms. Trotter's head:

> The scalp hair was slipping due to decompositional change. . . .  The facial skin appeared to have been removed due to decompositional change and postmortem insect and animal activity. Upon reflecting the residual soft tissue around the right eye, rodent teeth impressions were identified. The nasal cartilage was intact. Soft tissue was absent from the nose and midfacial areas. . . .  The tongue was protruding and dark black in color due to decompositional change. The oral cavity contained fly larvae. . . . Both ears were markedly discolored due to decompositional change. . . . The neck was remarkable for a brown stocking ligature which was tied in the back in a simple knot. There was a 3 by 2-3/4 inch defect on the anterior neck with liquefaction of tissue, maggot activity, and blood present.

In addition to her external observations, Dr. Carter performed an extensive internal examination.  To summarize, some of Ms. Trotter's internal organs "maintained their usual anatomic relationships" and were "intact," though some organs were "remarkable for decompositional change" or had "mild decompositional change."  For instance, Dr. Carter observed "loss of the normal tissue architecture" in the pancreas, "[t]he left and right adrenal glands were markedly autolyzed," and the kidneys had "architectural change [that was] obscured due to decompositional change."  The brain was "semi-liquid" and had a "complete loss of normal tissue architecture when remove[d]."  Dr. Carter observed that the contents of Ms. Trotter's stomach included a "tan liquid in which large pieces of white meat, consistent with chicken, and pieces of potato, consistent with french fries were observed."  The record contains numerous photographs from the crime scene and autopsy which reflect Dr. Carter's observations.

Dr. Carter's report stated that she preserved tissue samples for both toxicological and histological examination.[1]  Specifically, "[r]epresentative sections of all major organs were retained in formalin."  Dr. Carter never performed a microscopic examination of any tissue.

Dr. Carter's report listed the cause of death as "asphyxia due to ligature strangulation."  Her report, however, did not estimate on what date Ms. Trotter died.

*Trial Testimony and Evidence*

The State of Texas charged Swearingen with capital murder committed in the course of a kidnapping or sexual assault.  Because no eyewitness to her murder came forward and Swearingen provided no confession to the crime, the State of Texas built its case on circumstantial evidence proving Swearingen's culpability.  One reviewing court has listed the extensive evidence of guilt which the State adduced at trial as follows:

- On the evening of December 7, 1998, two of [Swearingen's] acquaintances, the Fosters, witnessed a phone conversation in which [Swearingen] arranged for a lunch meeting with a girl at a library the following day, and [Swearingen] then told the Fosters that the girl was Melissa Trotter, a college student from Willis;

- Three witnesses saw [Swearingen] sitting with Melissa in the Montgomery College library between 11:30 a.m. and 1:30 p.m. on December 8, 1998;

- Melissa's Biology teacher saw Melissa leave the Montgomery College library with a male shortly after 1:30 p.m.;

- Melissa's car remained in the Montgomery College parking lot following her disappearance on December 8, 1998;

---

[1]    The subsequent toxology report states that "[u]nless otherwise requested, specimens will be discarded one year after the date of receipt."  The record does not include a histological report or any statement about the potential destruction of tissue samples preserved for microscopic examination.

- At 2:05 p.m. on December 8, 1998, [Swearingen] called Sarah Searle and said that he was at lunch with a friend;

- Sometime around 3:00 p.m. on December 8, 1998, [Swearingen's] landlord saw [Swearingen's] truck leaving from behind his home;

- At 3:03 p.m. on December 8, 1998, [Swearingen] placed a cell phone call that utilized a cell tower near FM 1097 in Willis, Texas, which would be consistent with [Swearingen] driving from his home to the Sam Houston National Forest;

- [Swearingen's] wife testified that she found their home in disarray on the evening of December 8, 1998, but none of the Swearingen's property was missing;

- [Swearingen's] wife observed Melissa's cigarettes and lighter in [Swearingen's] home that evening, and those items were subsequently recovered from [Swearingen's] home during the investigation;

- [Swearingen] contacted police that evening and reported an alleged burglary of his home, at which time he falsely claimed to have been out of town from 11:00 a.m. on December 7, 1998, through 7:30 p.m. on December 8, 1998, and also falsely claimed that someone had stolen his VCR and jet ski;

- There was no sign of any prying mechanism having been used on the door to [Swearingen's] home, and his jet ski was subsequently found at a repair shop where [Swearingen] had dropped it off for maintenance prior to Melissa's disappearance;

- [Swearingen] called an ex-girlfriend on the evening of December 8, 1998, and told her that he was in trouble and that the police might be after him;

- When the Fosters heard that Melissa Trotter was missing on December 9, 1998, they contacted [Swearingen], who claimed he did not remember the last name of the girl with whom he had met the day before;

- When Mrs. Foster then told [Swearingen] that she recalled him saying the last name "Trotter," and that a girl named Melissa Trotter was now missing, the phone went dead;

- On December 11, 1998, [Swearingen] told an acquaintance that he anticipated being arrested by Montgomery County authorities;

- Later in the day on December 11, 1998, after [Swearingen] observed an officer radio in his truck's license plate number, [Swearingen] sped away and led the officer on a high speed chase that ended in front of the home of [Swearingen's] mother and stepfather;

- [Swearingen] was arrested on several outstanding warrants following the high-speed chase, at which time he asked that his hands be placed in front of him rather than behind because his arm and ribs were sore;

- Following [Swearingen's] arrest, law enforcement authorities observed and photographed red marks on [Swearingen's] neck, cheek, and back;

- On December 17, 1998, two neighbors of [Swearingen's] mother and stepfather collected numerous pieces of torn paper from along their street, which turned out to be Melissa Trotter's class schedule and some health insurance paper work Melissa's father had given to her;

- Melissa's body was discovered in an area of the Sam Houston National Forest with which [Swearingen] would have been familiar from previous time spent there;

- The ligature used to asphyxiate Melissa was a single leg torn from a pair of panty hose belonging to [Swearingen's] wife, the remainder of which was recovered from [Swearingen's] home during the investigation;

- The Harris County Chief Medical Examiner testified that during the digestive process, a person's stomach will usually not empty in less than two hours, and any food within the stomach at death will remain there;

- The contents of Melissa's stomach at the autopsy, which included what appeared to be chicken and a french fry-like form of potato, were consistent with the tater tots she had eaten at Montgomery College shortly before leaving with [Swearingen] and the Chicken McNuggets she and [Swearingen] had apparently purchased at the nearby McDonald's on December 8, 1998;

- Based on the state of decomposition of Melissa Trotter's body, including the presence of fungi that take "several weeks' time" to develop, the Harris County Chief Medical Examiner estimated

Melissa Trotter's death to have occurred twenty-five days prior to the discovery of her corpse, which is consistent with December 8, 1998;

• A note that had been given to Melissa by another student on the morning of December 8, 1998, was found in a pocket of Melissa's jeans during the autopsy;

• There were numerous cross-matches of fibers, hairs, and paint between Melissa's body and clothing and [Swearingen's] jacket, master bedroom, and truck;

• Two of Melissa's hairs that were recovered from [Swearingen's] truck still contained the anagen root, indicating they had been forcibly removed from Melissa's head;

• A Luminal test on the seats of [Swearingen's] truck indicated that they had been wiped down with Armor All, and two empty containers of Armor All wipes were found in the garbage at [Swearingen's] home;

• When [Swearingen's] good friend, Elyese Ripley, visited him in jail on January 9, 1999, [Swearingen] asked her to lie and say that she had been with him on the day Melissa disappeared and that they had gone to the Texaco-McDonald's near Montgomery College;

• Around early May of 1999, [Swearingen] fabricated a purportedly anonymous exculpatory letter that described the murder with explicit details that were confirmed by investigators, the medical examiner, and [Swearingen's] own medical expert, including the facts that Melissa was injured on the left side of her face, her neck was cut, one of her shoes had fallen off, she was laid among the bushes on her back, and she was wearing red underwear;

• Later in May of 1999, [Swearingen] was asked by a cell mate whether he had committed the murder and [Swearingen] replied, "Fuck, yeah, I did it," and stated that he was just trying to avoid the death penalty.

*Ex parte Swearingen*, No. WR-53,613-04, Supplemental Record at 510-15 (footnotes and record citations omitted).[2]

---

2    The Court of Criminal Appeals found that the record supported these findings and adopted them without alteration.  *See Ex parte Swearingen*, 2008 WL 152720 (Tex. Crim. App. 2008)

The State called Dr. Carter as a witness in the guilt/innocence phase.  The State's examination of Dr. Carter did not comprehensively discuss the date on which Ms. Trotter was murdered.  Instead, the State's questioning focused on: (1) whether Swearingen had raped her and (2) whether he killed her by strangling her with pantyhose or by stabbing her in the neck.  The date of Ms. Trotter's death was only a tangential and somewhat inferential issue at trial.

Dr. Carter, nonetheless, conveyed her external observations of the body.  Dr. Carter testified that "[t]he body was received in a state of moderate, decomposition, that means the body tissue had begun to break down, change color and become very soft and liquidy."  Tr. Vol. 28 at 18-19.  She explained that "there is a lot of damage and decompositional change [to the front of the body], darkening to facial skin."  Tr. Vol. 28 at 30-31.  She explained that photographs showed "some skin discoloration in the stomach area . . . [which] is part of the body breaking down . . . and there appears to be some fungal organisms gathering between the layers of skin tissue[.]"  Tr. Vol. 28 at 22-23.  She explained that fungal growth would grow in "dank and wet" conditions after "several weeks' time have elapsed."  Tr. Vol. 28 at 27-28.  Dr. Carter testified that the fungal growth "assists us in engaging a time of death."  Tr. Vol. 28 at 28.  The stomach contents, according to Dr. Carter's testimony, provided another factor that could help tell when Ms. Trotter died.  Tr. Vol. 28 at 38-39.  Dr. Carter commented that "cool temperature somewhat slows down decomposition.  Warm temperature will accelerate, speed it up, usually."  Tr. Vol. 28 at 50.

---

(unpublished).  The state courts relied on this same list of inculpatory factors in denying Swearingen's third state habeas application.  *Ex parte Swearingen*, WR-53,613-05, at 169-73.

The State's questioning about internal organs, however, was brief.  The State inquired whether Dr. Carter saw anything "remarkable or unremarkable" about "the abdominal region," "the heart area," "the lungs," and the "pancreas and spleen."  Tr. Vol. 28 at 42-43.   Dr. Carter answered that she observed nothing remarkable, "just decompositional change."  Tr. Vol. 28 at 42-43.

In the only interchange relating directly to the date that Ms. Trotter died, the State asked Dr. Carter: "Based on the evidence that you saw and the evidence you've since gathered, do you have an opinion as to how long that body had been there?"  Tr. Vol. 28 at 45.  Dr. Carter replied that she "arrived at the opinion of the body being dead for approximately 25 days or so, based upon the appearance."  Tr. Vol. 28 at 45.

Cross-examination of Dr. Carter focused on the manner of death, whether she had facial bruising, and the possibility that she had been sexually assaulted.  The questioning briefly turned to how long the stomach contents would take to digest, Tr. Vol. 28 at 91-94, but otherwise did not address the evidence that would establish a date of death.

After investigating those facts establishing Swearingen's identity as the murderer, his trial attorneys focused their efforts on attacking the dual aggravators in the indictment that made his a capital offense.  Trial counsel argued that, even if Swearingen killed Ms. Trotter, the evidence did not conclusively prove that he kidnapped or sexually assaulted her.  To that end, trial counsel retained the services of Dr. Raul Lede, a pathologist, largely to counter testimony that Swearingen strangled or raped Ms. Trotter.  In a post-judgment affidavit, trial counsel explained that "Dr. Lede . . . confirmed the findings of Dr. Carter regarding the date and time of death."  Thus, Dr. Lede's testimony did not dwell on the time of death, other than to comment that it "is probably one of the most

challenging question[s] for a pathologist" and that "the answer is one of the least dependable answers that a pathologist can provide[.]"  Tr. Vol. 32 at 72.  Trial counsel briefly asked Dr. Lede about the length of time it took to digest a meal.  Tr. Vol. 32 at 72-73.  On cross-examination, however, Dr. Lede opined that, if Ms. Trotter's body had been exposed to the elements for 25 days, the ligature around her neck "would have gotten tighter."  Tr. Vol. 32 at 112.

Swearingen took the stand at trial and proclaimed his innocence.  He testified that, after he had lunch with Ms. Trotter on December 8, he left her in the company of another man and then visited his grandmother.  The trial evidence and testimony soundly proved that Swearingen fabricated his alibi.[3]  The jury found Swearingen guilty of capital murder.

In a separate punishment phase, the prosecution presented evidence of numerous extraneous offenses committed by Swearingen, including aggravated kidnappings, aggravated sexual assaults, false imprisonment, burglary, false identification as a police officer, and theft.  Many of the kidnapping and sexual assault offenses bore striking similarity to the killing of Ms. Trotter.  While incarcerated before trial, Swearingen was a penological problem as he attempted to escape, possessed a weapon, and fought in jail.  The jury answered Texas' special issues in a manner requiring the imposition of a death sentence.  The Texas Court of Criminal Appeals affirmed Swearingen's conviction and sentence on direct appeal, specifically finding that the evidence sufficiently supported the jury's verdict.  *Swearingen v. State*, 101 S.W.3d 89 (Tex. Crim. App. 2003).

---

[3]     While Swearingen now claims to be actually innocent, he does not explicitly rely on the alibi he proffered at trial nor provide new evidence to support that story.

*Post-Conviction Litigation*

Since the finality of his conviction, Swearingen has filed a convoluted tangle of habeas applications, *pro se* motions, mandamus actions, and amended pleadings. Throughout, Swearingen has tried to cast doubt on various aspects of the trial evidence against him.  Swearingen's challenges have taken evolving and overlapping paths, though no court to this point has seriously questioned the integrity of his conviction.

Swearingen maintained his innocence at trial.  The most prominent feature of Swearingen's post-judgment litigation has been his reliance on science to limit the amount of time that Ms. Trotter's corpse could have been on the forest floor.  At each level of post-judgment review, Swearingen has renovated and modified different habeas claims which, at their core, assert his innocence on the grounds that Ms. Trotter was killed after the police arrested him on December 11, 1998.

In his first state habeas action, Swearingen relied on expert affidavits which suggested that the progression of insect development associated with Ms. Trotter's corpse could only have started in mid-December.  Swearingen initially faulted trial counsel for not "using forensic evidence, particularly entomological evidence" to "challenge the date of death."  (Instrument No. 20 at 10).  Swearingen's post-conviction entomological expert placed Ms. Trotter's death in a narrow window during mid-December when weather conditions were favorable for insect colonization.  The state court, however, found that Swearingen provided insufficient data, especially concerning weather conditions immediately around the body, to question the jury's verdict.  *Ex parte Swearingen*, No. 53,619-01, at 475-76.  More importantly, the state habeas court observed that Swearingen's argument that Ms. Trotter died in mid-December fatally

conflicted with unimpeached information about the contents of her stomach, "the state of decomposition of Melissa Trotter's body, the fungal development present, and visible insect progression[.]"  *Ex parte Swearingen*, No. 53,619-01, at 476.

In his first federal habeas action, this Court funded expert assistance to investigate entomological evidence further, though Swearingen did not explicitly raise an actual-innocence claim.   Swearingen's petition also accused Dr. Carter of having "pro-prosecution bias," "intentionally skew[ing] her testimony in order to ensure a capital conviction," "shap[ing] her testimony to fit the State's theory of the case," and "abandon[ing] scientific and medical objectivity," though he did not seek relief on that basis.  (*Swearingen v. Dretke*, 04-cv-2058, Instrument No. 21 at 6-7).  This Court denied Swearingen's petition and the Fifth Circuit affirmed, *Swearingen v. Quarterman*, 192 F. App'x 300 (5th Cir. 2006).

Swearingen returned to state court and refined his arguments about entomological evidence.   A second state habeas action extensively examined whether the insect colonization found on Ms. Trotter's body indicated a limited period of exposure to the elements that postdated Swearingen's December 11, 1998 arrest.  Swearingen's expert witnesses there considered entomological evidence and a variety of additional information, including: the effects of the climate as shown by official reports and Swearingen's research; the unique environmental conditions in which her body was found as shown by crime scene videos and photographs; and Ms. Trotter's weight both before death and during the autopsy.

The state district court held an evidentiary hearing on Swearingen's second state habeas application.  The uneven decomposition of Ms. Trotter's corpse was a prominent

issue in the hearing.  According to Swearingen's experts, parts of her body, including her face, showed marked decomposition but other areas showed much less or almost no decomposition. Swearingen's experts opined that Ms. Trotter's corpse had probably not been exposed to the elements for more than a week or two.  Nevertheless, Swearingen's experts could not reconcile entomological evidence with Dr. Carter's observation that some parts of Ms. Trotter's body showed distinct decay.  As this Court will discuss later, Swearingen's experts clumsily tried to square their findings with the uneven decomposition and the known facts about the crime.  Ultimately, the state court found that Swearingen's efforts did not exculpate him, largely because his experts could not harmonize their findings with the circumstances of the crime and all the scientific evidence. *Ex parte Swearingen*, No. 53,619-04, at 505-42.  On January 16, 2008, the Court of Criminal Appeals adopted the lower court's findings and denied relief.

Swearingen then filed a third state habeas action challenging the date of death (among other issues).  This time, Swearingen supported his claims with an affidavit from Dr. Carter.  Dr. Carter's affidavit explained that she had focused her trial testimony only on external features of the body, especially "marked decomposition of the head and neck region," "the degree of maggot activity in this region of the body," and "fungal growth," because the attorneys' questioning shaped her answers.  Her affidavit stated:

> I was not asked by prosecutors, or by defense counsel, to address the significance of my internal examination of Ms . Trotter's body. Nor was I asked to address in detail the question of how long Ms. Trotter's body had been left exposed in the Sam Houston National Forest.  Instead, the focus of the prosecution and the defense was on whether the forensic evidence indicated a rape or kidnapping had occurred.   The majority of the questions from both sides were directed at whether autopsy findings indicated vaginal bruising, blunt trauma to the head, and whether the cause of death was asphyxiation by ligature or a sharp forced entry wound to the neck.

Dr. Carter's affidavit noted that "[d]ecomposition in this case was strikingly uneven. The decomposition seen in during [*sic*] the external examination of the body, particularly of the head and neck region, was substantial."  In particular, she noted "partial skeletonization of the head and neck region due to decomposition and insect and mammalian scavenging. As stated in the report, soft tissue was absent from the nose and midfacial areas, and the tongue was dark due to decompositional changes, and there was skin slippage and slippage of the scalp."  But she also recognized that the decomposition of the internal organs "appears less advanced."  Dr. Carter opined that the characteristics of the internal organs and Ms Trotter's weight would "support[] a forensic opinion that the body had not been exposed more than two weeks in the forest environment," though she did not explicitly state how that opinion would impact her earlier testimony.

Dr. Carter did not reconcile her internal and external observations, nor explain how the limited internal decomposition fit into the other facts known about the crime. Importantly, Dr. Carter did not revise or recant the observations she made in the autopsy report.  *See Swearin*gen, 556 F.3d at 348 ("Dr. Carter does not address the correctness of her original testimony based on decomposition and fungal growth[.]").   In fact, her affidavit reinforced her earlier opinion that external evidence of decomposition, especially of the head and neck region, was substantial.

Swearingen tried to raise actual-innocence and ineffective-assistance-of-counsel claims based on Dr. Carter's affidavit, but the Texas Court of Criminal Appeals found

that those claims did not meet Texas' stringent requirements for filing a successive habeas application. *See* TEX. CODE CRIM. PRO. art 11.071 §5.[4]

*Claims Swearingen Championed on the Eve of Execution*

Facing an execution date of January 27, 2009, Swearingen filed a fourth successive state habeas action. Swearingen based this action on a "factual basis . . . [that] was unavailable until the recent microscopic examination of the tissues in this case." *Ex parte Swearingen*, No. 53,619-09, at 11. Swearingen based his state habeas claim on histological tissue from the autopsy that the medical examiner's office had preserved in a paraffin block. Swearingen outlined his efforts to obtain tissue samples from the autopsy, emphasizing his interaction with Dr. Luis Sanchez from the Harris County Medical Examiner's Office, whom he had relied on as an expert witness in earlier habeas proceedings. Swearingen stated that "Dr. Sanchez did not indicate at any of these times that microscopic evidence might be relevant to [the date Ms. Trotter was killed and left in the woods] and, it appears that he did not prepare or review any of it." *Ex parte Swearingen*, No. 53,619-09, at 12. On December 17, 2008, "upon hearing that the [Texas Court of Criminal Appeals] had denied relief on his third application for writ of habeas corpus," Swearingen "contacted Dr. Sanchez's office by telephone and asked that the [medical examiner] look for any tissue." *Ex parte Swearingen*, No. 53,619-09, at 12. Swearingen told the Court of Criminal Appeals that he previously "did not have any reason to believe that there was a paraffin block at the [medical examier's] office that included samples of forensically important muscle and nerve tissue," the medical

---

[4]     The Court of Criminal Appeals authorized consideration of a claim that the prosecution had presented false evidence on a different factual basis than the one Swearingen raises in this federal action.

examiner's office "reported that it had a paraffin block containing lung and unidentified fatty tissue" on January 15, 2009. *Ex parte Swearingen*, No. 53,619-09, at 13.

Swearingen had slides of the tissue prepared and sent to Dr. Lloyd White, a Deputy Medical Examiner for Tarrant County, Texas who had previously provided affidavits relating to the timing of Ms Trotter's death. After a microscopic analysis, Dr. White concluded that the "tissues are of an individual who has been dead no more than two or three days." Dr. White limited his conclusion to the newly analyzed tissue, without regard to additional information known about the condition of Ms. Trotter's body or the circumstances of her death. He notably did not reconcile his findings with the incongruous evidence showing extensive decomposition on other parts of Ms. Trotter's body. Dr. White also did not square his new opinion that Ms. Trotter had been dead for only two or three days with earlier affidavits provided by Swearingen's experts that suggested a longer period of exposure in the woods.

In a succinct order, the Court of Criminal Appeals refused to allow Swearingen to proceed in another successive habeas action based, in part, on Dr. White's affidavit. *Ex parte Swearingen*, 2009 WL 249778 (Tex. Crim. App. Jan. 27, 2009).

Swearingen had contemporaneously filed a motion in the Fifth Circuit asking permission to litigate a second federal habeas petition. Among other issues, Swearingen argued that: he is actually innocent; the prosecution presented false and misleading testimony from Dr. Carter by not asking her questions about the internal conditions in Ms. Trotter's corpse; trial counsel failed to investigate the internal findings; and his trial attorneys should have developed the same evidence which Dr. White did through examining the paraffin block. The Fifth Circuit authorized this Court to consider whether

a successive federal action should proceed on three issues: "(1) *Giglio* violations in the State's presentation of Dr. Carter's testimony; and (2) *Strickland* violations in trial counsel's cross-examination of Dr. Carter, and [trial counsel's] failure to develop histological evidence." *Swearingen*, 556 F.3d at 349.

This Court, pursuant to the Fifth Circuit's action, must consider whether federal law conclusively allows Swearingen to litigate the merits of a successive federal habeas corpus petition.

## II.   A District Court's Duty to Determine Whether a Petitioner Meets Successiveness Filing Requirements

Federal habeas review strongly encourages a petitioner to present all legal and factual arguments in one habeas petition. *See McCleskey v. Zant*, 499 U.S. 467, 498 (1991) (recognizing "the principle that petitioner must conduct a reasonable and diligent investigation aimed at including all relevant claims and grounds for relief in the first federal habeas petition").   Accordingly, the AEDPA "greatly restricts the power of federal courts to award relief to state prisoners who file second or successive habeas corpus applications." *Tyler v. Cain*, 533 U.S. 656, 661 (2001).   Congress intended its limitation on successive petitions to encourage finality and to preserve comity with the state courts. *See Calderon v. Thompson*, 523 U.S. 538, 559 (1998) ("Section 2244(b) of the statute is grounded in respect for the finality of criminal judgments."); *Johnson v. Dretke*, 442 F.3d 901, 909 (5th Cir. 2006) ("One purpose of AEDPA is to enforce the preference for the state's interest in finality of judgment over a prisoner's interest in additional review.").   To that end, the AEDPA generally anticipates a "one bite at the post-conviction apple" approach to federal habeas review. *United States v. Barrett*, 178 F.3d 34, 57 (1st Cir. 1997).

The AEDPA protects against abuse of the habeas writ by mandating that, "if the prisoner asserts a claim that was not presented in a previous petition, the claim must be dismissed unless it falls within one of two narrow exceptions." *Tyler*, 533 U.S. at 661. The AEDPA sets out a bifurcated procedure before conferring jurisdiction over an inmate's successive claim. First, a circuit court preliminarily authorizes the filing of a successive action if a petitioner shows that it is "reasonably likely" that his successive petition meets section 2244(b)'s "stringent requirements." *In re Morris*, 328 F.3d 739, 740 (5th Cir. 2003). This determination, however, is "'tentative'" in that a district court must dismiss the habeas action that the circuit has authorized if the petitioner has not satisfied the statutory requirements. *Reyes-Requena v. United States*, 243 F.3d 893, 899 (5th Cir. 2001) (quoting *Bennett v. United States*, 119 F.3d 468, 469 (7th Cir. 1997)). Thus, the statute makes the district court a "second-gatekeeper" that "conduct[s] a 'thorough' review to determine if the [petition] 'conclusively' demonstrates that it does not meet AEDPA's second or successive motion requirements." *Reyes-Requena*, 243 F.3d at 898-99 (quoting *United States v. Villa-Gonzalez*, 208 F.3d 1160, 1165 (9th Cir. 2000)); *see* 28 U.S.C. § 2244(b)(4).

The Fifth Circuit's tentative decision that Swearingen has met the AEDPA's filing requirements does not bind this Court. *See Swearingen*, 556 F.3d at 349 ("We reiterate that this grant is tentative in that the district court must dismiss the motion that we have allowed the applicant to file, without reaching the merits, if the court finds that the movant has not satisfied the § 2244(b)(2) requirements for the filing of such a motion."); *see also Jordan v. Secretary, Dept. of Corrections*, 485 F.3d 1351, 1358 (11th Cir. 2007) (stating that it  makes "no sense for the district court to treat [that] *prima facie*

decision as something more than it is or to mine [the circuit court's] order for factual ore to be assayed.  The district court is to decide the § 2244(b)(1) & (2) issues fresh, or in the legal vernacular, *de novo*."); *In re Johnson*, 322 F.3d 881, 883 (5th Cir. 2003) (finding the circuit court's decision to be "tentative"); *Brown v. Lensing*, 171 F.3d 1031, 1032 (5th Cir. 1999) ("[T]he trial court must make its own determination that the statutory prerequisites are satisfied.").  This Court "must conduct a thorough review to determine if [Swearingen's pending petition] conclusively demonstrates that it does not meet AEDPA's second or successive motion requirements."  *Johnson*, 322 F.3d at 883.

The burden of showing statutory compliance rests on the petitioner.  *See Moore v. Dretke*, 369 F.3d 844, 845 n.1 (5th Cir. 2004) ("The applicant bears the burden of demonstrating that the petition does in fact comply with the statute, and the district court shall dismiss the petition unless that showing is made."); 28 U.S.C. § 2244(b)(4) ("A district court *shall* dismiss any claim presented in a second or successive application that the court of appeals has authorized to be filed *unless the applicant shows that the claim satisfies the requirements of this section*.") (emphasis added).  If a petitioner fails to meet his burden, this Court is "required to dismiss" the petition.  *Tyler*, 533 U.S. at 667.

Before his successive action will continue, Swearingen must prove:

> (1)    the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and
>
> (2)    the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2244(b)(2)(B).  A petitioner must comply with both prongs of 28 U.S.C. § 2244(b)(2)(B) to proceed in a successive habeas action.  *See Johnson*, 442 F.3d at 911

(noting that a petitioner's failure to comply with one prong makes it unnecessary to address the second one). In other words, this two-prong statutory requirement only "affords an opportunity to bring new claims where the petitioner can show that he was not at fault for failing to raise those claims previously and where the claim, if meritorious, would sufficiently undermine confidence in the judgment at issue." *Evans v. Smith*, 220 F.3d 306, 323 (4th Cir. 2000).

The complex nature of Swearingen's arguments requires much care in sorting out his claims. While the Fifth Circuit only allowed him to proceed on three discrete issues, Swearingen has extensively briefed issues that the Fifth Circuit refused to authorize – such as actual innocence. Swearingen also supports his claims with arguments he developed at trial and thereafter, such as entomological dating. Swearingen's successive federal petition, however, explicitly raises the following grounds for relief:

1.  Swearingen is actually innocent of the murder.

2.  Trial counsel provided constitutionally ineffective legal assistance by: (a) not adequately investigating histological evidence and (b) inadequately cross-examining Dr. Joye M. Carter, the medical examiner who testified at trial.

3.  The State of Texas recklessly or knowingly sponsored false or misleading testimony in violation of *Giglio v. United States*, 405 U.S. 150 (1972), through Dr. Carter's testimony.

This Court has already found that federal law does not recognize actual innocence as a ground for relief.[5] In fact, the Fifth Circuit explicitly refused to allow Swearingen to advance an actual innocence claim. Only the issues designated by the Fifth Circuit are properly before the Court: "(1) *Giglio* violations in the State's presentation of Dr.

---

[5]   Insofar as Swearingen anticipates that the Supreme Court may eventually sanction an actual-innocence cause of action, he may seek authorization for filing a new action on that "new rule of constitutional law" when it is "made retroactive to cases on collateral review by the Supreme Court." 28 U.S.C. § 2244(b)(2)(A).

Carter's testimony; and (2) *Strickland* violations in trial counsel's cross-examination of Dr. Carter, and his failure to develop histological evidence." *Swearingen*, 556 F.3d at 349.  The Court emphasizes that this preliminary review is not an adjudication of the merits of Swearingen's claims or an application of the AEDPA's deferential standards, but the limited and narrowly cabined review Congress has given federal courts before jurisdiction vests to consider successive habeas claims.

Swearingen has had a full opportunity to show compliance with the statute. (Instrument Nos. 5 and 6).  Swearingen has filed an amended petition and submitted other briefing.  (Instrument No. 24).[6]  Respondent has filed a pleading arguing that Swearingen has not met the AEDPA's successive petition requirements.   (Instrument No. 27). Swearingen has filed a reply.  (Instrument No. 34).  This Court now finds, under its statutory authority in 28 U.S.C. §2244(b)(4), that Swearingen has not shown the AEDPA allows him to proceed in another federal habeas action.

**III.    The Factual Predicate for the Claims Existed Well Before Swearingen's Successive Petition**

This Court must first conclusively determine whether "the factual predicate for the claim could not have been discovered previously through the exercise of due diligence."   28  U.S.C.  § 2244(b)(2)(B)(i).   The Supreme Court refers to section 2244(b)(2)(B)(i) as a gateway for claims based on "new evidence," a "new factual

---

[6]    Swearingen's amended petition summarily asks this Court to hold an evidentiary hearing on his compliance with 28 U.S.C. § 2244(b)(2).  When Swearingen asked for a hearing in his initial pleadings, the Court noted that Swearingen "did not describe what witnesses or evidence he wishes to present."  (Instrument No. 5 at 3).  He still has not stated what testimony or evidence he wishes to develop at a hearing.  Swearingen must show the need for an evidentiary hearing.  He has not shown with any particularity why one is necessary, or even available, at this juncture. Because Swearingen has not indicated what evidence he wishes to present or which witnesses he wants to call, any evidentiary hearing would be a fishing expedition.  The Court finds that the objective factors in the record indicate that a hearing is not necessary.  In particular, Swearingen has given the Court no reason to believe that additional factual development will aid in deciding whether his successive claims were previously available to him.

predicate," or "newly discovered" facts. *See Gonzalez v. Crosby*, 545 U.S. 524, 531 (2005); *Pace v. DiGuglielmo*, 544 U.S. 408, 416 (2005); *Duncan v. Walker*, 533 U.S. 167, 189-90 (2001) (Breyer, J., dissenting); *Thompson*, 523 U.S. at 554.  This Court must decide whether the evidence Swearingen relies on "was not previously discovered or discoverable[.]"  *Leal Garcia v. Quarterman*, 573 F.3d 214, 221 (5th Cir. 2009).

Section 2244(b)(2)(B)(i) asks whether diligent efforts could have uncovered the factual basis for claims "previously."  Presumably, this looks at whether the inmate could have and should have uncovered and advanced his claims in his first federal habeas case. This is an objective inquiry.  The statute does not ask if an inmate acted with alacrity and ardor.  The Fifth Circuit has instructed that "the plain text of § 2244(b)(2)(B) suggests that due diligence is measured against an objective standard, as opposed to the subjective diligence of the particular petitioner of record."  *Johnson*, 442 F.3d at 908.  In other words, this Court does not evaluate whether the inmate himself was diligent in seeking the new factual predicate; the Court focuses on whether the information was available with "due diligence."  *In re McGinn*, 213 F.3d 884, 885 (5th Cir. 2000) (faulting a petitioner for not showing why he could not have advanced his "new" claims earlier). Consequently, a petitioner does not meet the AEDPA showing if the record includes "evidence that would put a reasonable attorney on notice of the existence" of the allegedly new material.  *Johnson*, 442 F.3d at 908.[7]

This Court appointed federal counsel for Swearingen on July 24, 2003, he filed his first federal petition on May 21, 2004, and this Court denied relief on September 8,

---

[7]     This inquiry is separate from the actual innocence inquiry in 28 U.S.C. § 2244(b)(2)(B)(ii).  The relative strength or weakness of the claims, or an inmate's ability to show actual innocence, plays no part in the 28 § 2244(b)(2)(B)(i) analysis.  The question is of the availability of evidence, not of its impact.

2005.  *Swearingen v. Dretke*, 04-cv-2058 (S.D. Tex.).  Swearingen must show that the evidence in this case was unavailable to him before his first habeas action.

The claims that the Fifth Circuit tentatively authorized rely on two factual predicates: (1) information regarding the State's interaction with its witnesses found in Dr. Carter's 2007 affidavit and (2) microscopic analysis of a block of paraffin containing tissue preserved from Ms. Trotter's autopsy.  Swearingen has not shown that those two factual predicates "could not have been discovered" before he filed his first habeas action.

A.      *Dr. Carter's Affidavit*

As noted above, Dr. Carter signed an affidavit in 2007 wherein she stated that neither the prosecution nor defense asked about her observations of the internal conditions of Ms. Trotter's corpse, and that certain other factors would have better informed her trial testimony.  The Fifth Circuit observed that Swearingen's *Gigilo* claim "rests not on the correctness of [Dr. Carter's testimony] (which could have been disputed at any time) but on the State's interactions with its witnesses, which could not have been known before her affidavit."  *Swearingen*, 556 F.3d at 348.  To proceed on this successive claim, Swearingen must show that knowledge about the State's interaction with its witnesses, flowing from Dr. Carter's affidavit, "could not have been discovered previously through the exercise of due diligence."   28 U.S.C. § 2244(b)(2)(B)(i).  Swearingen has not met this burden.

Swearingen extensively chronicles his efforts to develop this habeas claim.  To summarize, during his initial habeas proceedings Swearingen began collecting temperature and entomological data, his efforts in the successive state actions amplified

that data, his challenge to the time of death through entomology prompted him to analyze the condition of Ms. Trotter's internal organs, he purportedly sought remaining tissue samples from her autopsy, he consulted with several experts about various factors that would disprove the State's case, and finally he "asked forensic pathologist, Dr. Joye M. Carter, to review the evidence and provide an opinion in support of the innocence claims he raised in his third state application for a writ of habeas corpus." (Instrument No. 20 at 45). Swearingen claims that he "did not develop the basis for asking Dr. Carter to reconsider her opinion until after he obtained expert forensic opinions from other pathologists demonstrating that the 25 day post-mortem interval . . . was unsupported by the evidence." (Instrument No. 34 at 15). Through her affidavit, Swearingen first obtained Dr. Carter's opinion about the information she possessed and the questions the parties asked her at trial. Also, the affidavit was the first opportunity for Dr. Carter to comment on certain pieces of information ("a video of the crime scene dated January 2, 1999"; "medical records giving Melissa Trotter's weight before she was reported missing"; and "temperature date showing daily high, low, and average temperatures in the Conroe, Texas area for the period December 8, 1998 through January 2, 1999").

Swearingen only briefly discusses why he could not have taken Dr. Carter's affidavit before 2007.[8] Other than referring to her affidavit as the result of an evolving investigative effort, Swearingen hints that Dr. Carter was "reclusive" (Instrument No. 20

---

[8]    Swearingen does state that "his three constitutional claims [were] unavailable until the recent microscopic examination of the tissues in this case." (Instrument No. 20 at 43). As Swearingen's production of Dr. Carter's affidavit predates the microscopic examination, the Court summarily rejects this argument to allow consideration of his *Giglio* claim under the AEDPA standards. As noted by Respondent, "nothing in the pleadings suggests that Dr. Carter has seen the histological evidence, and her reaction to the evidence is unknown." (Instrument No. 24 at 31). Swearingen also mentions that he did not obtain her affidavit until after other pathologists had reconsidered her findings. Dr. Carter's affidavit does not state that she reviewed that information when giving her opinion on the internal conditions of Ms. Trotter's body.

at 45 n.13) or "stopped practicing pathology altogether" (Instrument No. 34 at 15), so when he began looking for her, he only found her with difficulty late in the habeas process.

Respondent asserts that Swearingen could have and should have sought Dr. Carter's affidavit long before October 31, 2007.   Respondent argues that, "[h]ad Swearingen presented the evidence to her earlier, she likely would have formed her opinion earlier.   Indeed, the evidence – the temperatures, the crime-scene information, and the weight information – was available before or at trial.  . . .  Swearingen waited some seven years to deliver the evidence to Dr. Carter to allow her to form her new opinion.  Seven years does not bespeak due diligence."  (Instrument No. 24 at 10).

While Swearingen extensively discusses the efforts he has made to uncover evidence about the time of death, the AEDPA inquiry is not whether he was active in trying to obtain relief.  The AEDPA does not ask if habeas counsel has acted zealously or actively sought new evidence.   The statute deals with the *availability* of the evidence. The question is an objective one: whether the factual predicate that underlies his claim was available if he acted with due diligence.  Swearingen has arguably shown that he has sought various ways of challenging his conviction and sentence.  He has pursued several different avenues of attacking the evidence that proved Swearingen was the killer. However, Swearingen has not shown that Dr. Carter would not have provided the same information from in her 2007 affidavit if someone had only asked her earlier.

Swearingen's first habeas application assailed Dr. Carter's opinion on the date Ms. Trotter died.  Swearingen could have obtained the empirical evidence on which Dr. Carter based her revised opinion – the temperature, the crime-scene information, and the

weight information – before trial or anytime thereafter.[9]  The fact that Dr. Carter's trial testimony did not address certain factors (such as Ms. Trotter's weight and the outside temperature) was obviously available at trial.  *See In re Nealy*, 223 F. App'x 358, 365 (5th Cir. 2007) (finding a prosecutorial misconduct claim was previously discoverable when the factual basis was available at trial).[10]  The fact that the State limited its questioning of her was likewise obvious.  Had Swearingen presented the readily available evidence to her earlier, nothing suggests that she would not have formed her opinion earlier.  *See In re Boshears*, 110 F.3d 1538, 1540 (11th Cir. 1997) (stating that due diligence means the petitioner "must show some good reason why he or she was unable to discover the facts" and that merely alleging that he "did not actually know the facts underlying his or her claim does not pass this test").  Swearingen at any time could have asked Dr. Carter why she limited her testimony, thus providing the same information as he obtained in the 2007 affidavit.  *See In re Schwab*, 531 F.3d 1365, 1366 (11th Cir. 2008) (refusing to authorize a successive petition on the changed testimony of an expert witness who testified at trial when the petitioner could have presented the expert with additional information and obtained his affidavit at any time after trial).  Swearingen has not shown that anything impeded him from taking Dr. Carter's before 2007.

---

[9]    Swearingen attached an affidavit from his entomological expert in his first state habeas action that considered weather conditions.  Swearingen also included newspaper accounts as attachments that referenced  Ms. Trotter's weight.  The crime scene photographs and video have been available since trial.

[10]    Swearingen argues that trial counsel should have realized that important information like weather conditions were missing from Dr. Carter's testimony.  The burden placed on trial counsel to investigate such information also falls on Swearingen's appellate and habeas attorneys.  Swearingen has not shown why he could not have realized the limited nature of Dr. Carter's testimony, just as he alleged trial counsel should have, which would have prompted him to secure her explanation of why she limited her testimony.

The most concrete statement Swearingen makes about why he only took her affidavit so late in the process was that he "tried to locate Dr. Carter before [his third state application the he filed on January 16, 2008] but he could not.  She quit pathology after leaving the HCME office in about 2002, and did not resume practice for several years. She apparently was reclusive."  (Instrument No. 20 at 45 n.13).  This statement, however, cannot carry the day.  In his "Motion for Order Authorizing Filing and Consideration of Second Petition for Writ of Habeas Corpus under 28 § 2254" which he filed in the Fifth Circuit, Swearingen cited a 2004 news article about Dr. Carter.  That article, published several months before Swearingen filed his federal habeas petition in 2004, explains that Dr. Carter left the medical examiner's office and had started a forensic consulting firm in Houston.  *See* Jenna Colley, *Former Medical Examiner Probes Different Career*, HOUSTON BUSINESS JOURNAL, Jan. 9, 2004.  During the time period contemporaneous with Swearingen's initial habeas action, Dr. Carter was actively consulting with attorneys in the Houston area.  Swearingen has not shown that diligent investigative efforts could not have found her then.

Here, Swearingen does not show that the evidence "could not have been discovered previously through the exercise of due diligence."  Instead, he shows that, while busily challenging his conviction on other grounds, he did not think to pursue the instant theory until 2007.  Swearingen has not shown that an assiduous investigator, armed with the readily available empirical data, could not have secured an affidavit from Dr. Carter from any time before 2007.[11]  No evidence exists, and he has suggested none,

---

[11]     The state courts found in one of his post-conviction actions that Swearingen "was free to present pathological evidence disputing Dr. Carter's estimate of 25 days either during trial or in conjunction with his first 11.071 application, but he declined to do so."  *Ex parte Swearingen*, No. WR-53,613-04 Supplemental Record at  529.

which shows that the information in any way "could not have been discovered previously." Swearingen has shown nothing more than that he did not think to secure her affidavit previously.

B.     *Histological Evidence*

Swearingen claims that trial counsel should have developed a defense based on the microscopic examination of issues taken during Ms. Trotter's autopsy. Swearingen contends that he was unaware until weeks before his scheduled execution that the medical examiner's office retained tissue samples in a paraffin block. On January 20, 2009, a week before his execution, an expert reviewed five slides containing tissue samples that had been preserved in the paraffin histology block. Dr. Lloyd White, an expert who has provided several affidavits on Swearingen's behalf, stated in an affidavit that "the issues are of an individual that has been dead no more than two or three days." (Instrument No. 14, Exhibit A.1). Swearingen argues that he cannot be faulted for not having the paraffin block even "as late as December 17, 2008, . . . [when] on that date the Medical Examiner merely reported a histology block with a piece of fat and lung tissue." (Instrument No. 34 at 18). Swearingen apparently informally asked the medical examiner to look for tissue samples while investigating entomological data after his initial round of habeas review. Swearingen suggests that he thought this material may have been destroyed within a year of trial. Thus, he argues, the tissue samples "could not have been discovered previously through the exercise of due diligence."   28 U.S.C. § 2244(b)(2)(B)(i).

Swearingen has made repeated efforts, both in state and federal court, to attack the timing of Ms. Trotter's death by showing weaknesses in Dr. Carter's autopsy. As part

of those efforts, Swearingen consulted with Dr. Luis A. Sanchez, Chief Medical Examiner at the Harris County Medical Examiner's Office.  Swearingen states that he made oral requests for tissue samples from Dr. Sanchez, but was told that none existed. Swearingen has not verified when he made oral requests.  Swearingen has not shown that oral requests for the production of such evidence constitutes due diligence or whether some other mechanism, such as written requests or court orders, would have produced the histological evidence before the eve of execution.  Swearingen possibly could have secured the paraffin block by official requests or by court order.[12]

But more importantly, the record shows that Swearingen should have been aware during his first round of federal habeas proceedings that the paraffin block was still in the custody of the Harris County Medical Examiners' Office.  The record does not support Swearingen's assertion that he "did not have any reason to believe [before December 2008] that there was a paraffin block at the [medical examiner's] office that included samples of forensically valuable muscle and nerve tissue."  (Instrument No. 20 at 47; *see also Ex parte Swearingen*,  No. 53,619-09, at 13).  A letter from Dr. Sanchez dated December 21, 2004, explicitly informed Swearingen that Dr. Carter had taken tissue samples and preserved them:

> Only one microscopic glass slide was prepared for the entire case, which contains a piece of lung and fatty tissue.  No other paraffin blocks were found in the histology laboratory under case number OC99-02.  Dr. Carter only testified as to her gross findings but did not state that she had not taken samples for microscopic evaluation, nor was she asked if she took sections for microscopic evaluation of any of the injuries and the significance of such sampling.

---

[12]    Swearingen asserts that he only became aware of that paraffin block after he investigated whether entomological evidence could pin down a different death date.  Still, Swearingen was aware of the entomological evidence before he filed his initial federal petition.  (*Swearingen v. Dretke*, 04-cv-2058 [S.D. Tex.], Instrument No. 19 at 6).

Swearingen, in fact, filed that letter twice with this Court during his initial round of habeas proceedings. (*Swearingen v. Dretke*, 04-cv-2058 (S.D. Tex.), Instrument No. 29, Exhibit A and Instrument 31, Exhibit B).  Dr. Sanchez speaks of the paraffin block in the present tense and describes the material it preserved.  The letter does not say that it was destroyed, but merely explains that Dr. Carter's trial testimony did not discuss the samples.  The letter put Swearingen on notice that the block existed, even if he had not yet decided that he would need to analyze that information.[13]

Swearingen has not explained why he did not secure that evidence during this initial habeas action, much less show that it was unavailable before that time.  Swearingen has not shown that, had he asked about the tissue samples at trial, during the first state habeas action, or anytime before filing his federal petition, the medical examiner's office would not have told him about the paraffin block as it did in 2004.

Dr. Sanchez's letter proves that Swearingen could have discovered the preserved tissue previously through the exercise of due diligence, had he only pursued that line of inquiry.  In fact, Swearingen's ineffective-assistance-of-counsel claim presumes that a

---

[13]     In his second state habeas action, Swearingen referenced that letter and commented that Dr. Sanchez "confirmed that microscope slides . . . had never been made" to confirm whether Ms. Trotter's corpse showed signs of vaginal bruising, but did not refer to the explicit statement that samples of "lung and fatty tissue" were still available in a paraffin block.  *Ex parte Swearingen*, No. 53,613-04, at 17.  The Court notes that Swearingen has never raised the claim that the paraffin block was suppressed as understood by *Brady v. Maryland*, 373 U.S. 83 (1963).  In state court, Swearingen asserted that: "Dr. Carter testified at trial that she had not conducted a microscopic examination, and her histology report did not indicate that tissues had been preserved except in formalin.  Undersigned counsel was informed by the Harris County Medical Examiner that these samples had been discarded.*"  Ex parte Swearingen*, 53-629-09, at 12 (Tex. Crim. App. Jan. 23, 2009).  While it is true that Dr. Carter's report mentioned that she took tissue samples and preserved them in formalin, it does not say she made slides, the trial testimony did not discuss whether or not she took those samples.  Her silence is not the same as saying she did not preserve samples.  Swearingen's expert at trial, however, stated that "the Medical Examiner's Office, not infrequently, and I think one report indicates that they obtain tissues which they save, but not necessarily prepared for microscope examination."  Tr. Vol. 29 at 77.  Swearingen makes no attempt, and has not suggested that he could, verify that the medical examiner's office said it had destroyed the samples.

trial attorney exerting reasonable efforts should have inquired into the histological evidence; Swearingen presents no reason why federal habeas counsel should not be held to that same expectation. Swearingen, by all accounts, only began that line of investigation on the eve of execution. The fact that Swearingen did not yet comprehend how to use that information does not make it objectively unavailable. As recognized by Respondent, "[h]e did not have to wait until Dr. White examined the histological evidence in 2009." (Instrument No. 24 at 54).

        C.      *Conclusion on 28 U.S.C. § 2244(b)(2)(B)(i)*

Since his conviction in 2000, Swearingen has commenced a pattern of piecemeal attacks on the date that Ms. Trotter was murdered. Only now, over nine years later, he has marshaled all the available information, but the record does not show that he could not have done so before waiting until the eve of his execution in January 2009. The Court, therefore, finds that Swearingen has not shown that the allegedly new information and evidence was not previously available. Swearingen's failure to meet 28 U.S.C. § 2244(b)(2)(B)(i) deprives this Court of jurisdiction over the merits of his successive habeas claims. For the reasons outlined briefly below, the Court also finds that Swearingen fails to satisfy the second prong of section 22544(b)(2)(B).

**IV.    Alternatively, Swearingen Has Not Clearly and Convincingly Shown Actual Innocence in Light of the Evidence as a Whole**

Even if Swearingen could meet the first prong of the AEDPA's successiveness requirements, he would still need to show "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would

have found the applicant guilty of the underlying offense." 28 U.S.C. § 244(b)(2)(B)(ii).
This inquiry, in essence, addresses actual innocence.

The Fifth Circuit has described this standard as "'a strict form of 'innocence,' . . .
roughly equivalent to the Supreme Court's definition of 'innocence' or 'manifest
miscarriage of justice' in *Sawyer v. Whitley*, [505 U.S. 333 (1992)].'" *Johnson*, 442 F.3d
at 911 (quoting 2 Randy Hertz & James S. Liebman, FEDERAL HABEAS CORPUS
PRACTICE & PROCEDURE § 28.3e, at 1459-60 (5th ed. 2005)); *see also House v. Bell*, 547
U.S. 518, 539 (2006) (comparing 28 U.S.C. § 2244(b)(2)(B)(ii) to the standard in
*Sawyer*); *In re Brown*, 457 F.3d 392, 395 (5th Cir. 2006) (same). This "miscarriage of
justice" exception "is concerned with actual as compared to legal innocence," *Sawyer*,
505 U.S. at 339, and "[t]he term 'actual innocence' means *factual*, as opposed to *legal*,
innocence." *Johnson v. Hargett*, 978 F.2d 855, 859 (5th Cir. 1992) (emphasis in
original). A petitioner faces a heavy burden in showing factual innocence because the
law only recognizes an inmate's actual innocence in "an extraordinary case." *Murray v.
Carrier*, 477 U.S. 478, 496 (1986).

Because of the unsettling proposition that a man could be actually innocent of
capital murder, but executed nonetheless due to procedural impediments, the Court will
briefly note that Swearingen's evidence of actual innocence falls far short of the
AEDPA's standard. Section 2244(b)(2)(B)(ii) asks this Court to evaluate "the facts
underlying the claim." Swearingen relies on affidavits from experts who maintain that
histological and other evidence proves that Ms. Trotter could only have been dead a few
days when her body was discovered on January 2, 1999, meaning that Swearingen, who
had been in jail since December 11, 1998, could not have committed the offense. This

Court must look at whether "the facts underlying [his] claim . . . viewed in light of the evidence as a whole" would show that, "but for constitutional error, no reasonable factfinder would have found" Swearingen guilty.  28 U.S.C. § 2244(b)(2)(B)(ii).  This Court will review Swearingen's compliance with section 2244(b)(2)(B)(ii) on all three of his successive claims at the same time, though the result would be the same if the Court analyzed each claim separately.

Since the finality of judgment, Swearingen has relied on the opinion of expert witnesses to exculpate himself.  Swearingen has only attached a few of the resultant affidavits to his latest federal petition.  This Court, however, must take a longitudinal look at all the evidence he has previously presented.  At various points, Swearingen's experts have provided opinions as expressed in the table below.

| Name | Date of Affidavit or Testimony | Evidence Considered by the Expert Witness | Estimated Date of Death or Time of Exposure | Record Citation |
|---|---|---|---|---|
| Dael E. Morris | February 14, 2002 | Crime scene and autopsy photographs, autopsy information, climate and weather conditions, entomological evidence | "insects would have first colonized Ms. Trotter's remains **December 16th to 18th, 1998**" | *Ex parte Swearingen*, No. 53,619-01 at 146-47; *Swearingen v. Dretke*, 04-cv-2058, Instrument No. 21, Exhibit B |
| Dael E. Morris | February 14, 2004 | Same information as her first affidavit | A more conservative estimate of date than first affidavit "would have yielded a time of death **after December 18, 1998**" | *Swearingen v. Dretke*, 04-cv-2058, Instrument No. 21, Exhibit C |
| Dael E. Morris | Sometime in 2007 | Same information as before but in the context of new temperature data | "oviposition leading to colonization by blow flies . . . occurred **December 18th, 1998**" | *Ex parte Swearingen*, No. 53,619-04 at 110-15 |
| Dr. James J. Arends | January 19, 2007 | The autopsy report, Ms. Morris' affidavit, temperature data, Dr. Carter's trial testimony | "Ms. Trotter's body was **exposed and colonized by blow flies after December 11, 1998** . . . if death occurred before December 11, 1998, the body would have to have been covered and stored" | *Ex parte Swearingen*, No. 53,619-04 at 118-19 |
| Dr. James J. Arends | March 26, 2007 | Same as first affidavit | **Conditions from December 8 to December 18, 1998 did not prevent insect egg deposition** | *Ex parte Swearingen*, No. 53,619-04 at 351-56 |
| Dael E. Morris | March 29, 2007 | Earlier information and new briefing by the State | While conditions on December 8 and 9th provided opportunities of ovipositing, **fly development did not suggest such a date before December 18th** | *Ex parte Swearingen*, No. 53,619-04 at 358-59 |
| Dr. Lloyd White | March 29, 2007 | Crime scene and autopsy information, a letter from Dr. Emilio Sanchez regarding vaginal bruising | States that a pathologist cannot make as precise estimation as Dr. Carter did at trial; autolysis to the pancreas and spleen happen "within **a day or so** of death, sometimes **within hours**," meaning that Ms. Trotter was a "**recently deceased individual**" | *Ex parte Swearingen*, No. 53,619-04 at 369-70 |

| Dr. Glenn M. Larkin | March 29, 2007 | Autopsy report | "post-mortem interval is **less than twenty-five days**" | *Ex parte Swearingen*, No. 53,619-04 at 372-73 |
|---|---|---|---|---|
| Dr. Luis Sanchez | State hearing on July 2, 2007 | Autopsy report and photographs, temperature data | Not impossible that she was murdered on December 8 but "that body most likely was **not in that forest for more than two weeks. It probably was some place before that**, but not in that forest." | *Ex parte Swearingen*, No. 53,613-04, Evidentiary Hearing at 17, 23 |
| Dr. James J. Arends | State hearing on July 2, 2007 | Autopsy report and photographs, crime scene videotape, Ms. Morris' opinions, weather conditions | "I do **not** think this body was in the woods **probably more than a week**" but **someone possibly froze her body** and moved it | *Ex parte Swearingen*, No. 53,613-04, Evidentiary Hearing at 74-82 |
| Dr. Joye M. Carter | October 31, 2007 | Her trial testimony, autopsy report, crime scene video, medical records giving Ms. Trotter's weight, temperature data | Condition of pancreas spleen and liver "support[] a forensic opinion that the body was not exposed . . . until **sometime after December 12, 1998**," as does the condition of breast tissue and the weight at autopsy | *Ex parte Swearingen*, No. 53,619-05 at 60-62; *Ex parte Swearingen*, No. 53,619-09 at 59-61 |
| Dr. Glenn M. Larkin | October 1, 2007 | Autopsy report, some trial testimony and photographs, and his earlier report | "**December 23, 2007, is the soonest** that Trotter's body could have been left in the woods" but other evidence "**strongly support[s] a date as late as December 30**" meaning "Mr. Swearingen was not person who left Ms. Trotter's body in the . . . [f]orest" | *Ex parte Swearingen*, No. 53,619-09 at 88-93 |
| Dr. Lloyd White | December 12, 2007 | Autopsy report and photographs, crime scene photographs, temperature data, medical records, affidavits from Dr. Larkin and Dr. Carter | Concurring with Dr. Carter that the internal observations mean that her body "was left in the woods **within fourteen days of the discovery of the body**" and with Dr. Larkin that "the body was left in the woods at or on about December 23, 1998 at the soonest, and **probably left there no sooner than December 27 or 28, 199[8]**." | *Ex parte Swearingen*, No. 53,619-05 at 109-10 |
| Dr. Lloyd White | January 21, 2009 | Slides of paraffin histology block, temperature data | "tissue in this section is entirely **incompatible with the body having been left at this location earlier that 29 or 30 December 1998**" | *Ex parte Swearingen*, No. 53,619-09 at 53-54 |
| Dr. Lloyd White | April 14, 2009 | Same data a previous affidavits and additional histological analysis | "Ms. Trotter died **no sooner than December 29 or December 30, 1998**" | Instrument No. 29, Exhibit A.2 |
| Dr. Stephen Pustilnik | No date | Autopsy report, slides, temperature data, and affidavits from Dr. White and Dr. Carter | "the date of death **on or about December 26, 1998**" | Instrument No. 29, Exhibit A.3 |

When remanding this case, the Fifth Circuit noted that inconsistencies among the affidavits would be problematic for Swearingen. *See Swearingen*, 556 F.3d at 348 n.6 ("Obviously, although each expert opines that the body was not placed in the woods on December 8, 1998, the differences undermine the credibility of their conclusions."); *cf. Dowthitt v. Johnson*, 230 F.3d 733, 742 (5th Cir. 2000) (a reviewing court must test

affidavits upon which an actual innocence claim rests for "inconsistency with the physical evidence").

Swearingen asserts that his experts' opinions are not in conflict, but are in agreement that that Ms. Trotter's body could not have been in the woods for a 25-day period. The Fifth Circuit recognized that area of confluence, but noted that the different opinions still raised credibility questions. *See Swearingen*, 556 F.3d at 348 n.6. The Fifth Circuit specifically observed the following differences in the expert opinions: Dr. Carter suggested a two-week period of exposure; Dr. Larkin a three- or four-day period; Dr. Sanchez a ten- to fifteen-day period (with possible refrigeration before that); and Dr. White a two- or three-day period. This Court would note that the other expert opinions exacerbate the lack of consensus observed by the circuit court: Ms. Morris' opined that a secondary colonizing insect oviposited on December 18; Dr. Arends stated that the body had been in the woods for about a week, but was probably frozen before then; and Dr. Pustilnik thought someone dumped her body on December 26. The Court also observes that some of the expert witnesses have given opinions that have progressed, without reconciling earlier ones: Dr. Larkin has gone from a period "less than twenty-five days" to "as late as December 30"; Dr. White has given periods ranging from "a day or so" to "no sooner than December 27 or 28" to no earlier "than 29 or 30 December." At some times, Dr. White has agreed with Dr. Carter's new assessment of a two-week period for some factors, but in other places suggested that some organs which were well-preserved usually degrade "within hours." Each expert has blessed their opinion with scientific certainty.

Swearingen's experts, however, have not consistently described the level of certitude science could place on when Ms. Trotter died. When Swearingen first began attacking the date of death, he first challenged Dr. Carter's ability to pinpoint when she died with any precision. Dr. White provided an affidavit which stated:

> Pathologists cannot accurately estimate a post mortem interval with the precision that Dr. Carter indicated she was capable of. Pathological estimates of time of death, using the type of evidence on which Dr. Carter relied, cannot be made with confidence after a body has been left unprotected for far less time than 25 days. A pathologist could only estimate a relatively broad range of weeks or even months during which Ms. Trotter died.

*Ex parte Swearingen*, No. 53,613-05, at 153. As Swearingen's attacks on the evidence have progressed, however, he has with greater and greater conviction estimated the date she died. Dr. White himself, for instance, has now stated "with scientific certainty" that "Ms Trotter died no more than two or three days before the body was recovered on January 2, 1999." (Instrument No. 20, Exhibit A.2). Certainly, "differences undermine the credibility of [the experts'] conclusions." *Swearingen*, 556 F.3d at 348.

Inconsistencies between the various affidavits apparently flow from gaps in the evidence used by the experts. Taken at face value, Swearingen's new scientific evidence appears highly exculpatory. Nevertheless, the credibility of that testimony depends on its relationship to the remainder of the evidence. Swearingen relies on experts who agree that the body had been exposed to the elements after he was jailed on December 11, 1998, though the experts have not looked at every piece of the evidentiary puzzle in making that assessment. Assuming that science can conclusively determine the length of time Ms. Trotter's body was exposed to the elements, any trustworthy analysis should

take into account the entire breadth of the pathological evidence.[14]   Some of Swearingen's experts have looked at insects, some have looked at cells, and some have reviewed photographs.  Swearingen now provides ample argument about how an earlier death date determined from histological analysis alone would influence his culpability. Yet the experts looking at histological evidence have not reconciled their opinions with entomology, photographic evidence, or the all the facts available to them.  None of Swearingen's experts have credibly considered the condition of Ms. Trotter's body "in light of the evidence as a whole."

The record contains evidence which completely contradicts Swearingen's contention that Ms. Trotter died at most three days before her body was discovered.  The autopsy report, testimony and evidence at trial, and testimony at the state evidentiary hearing have demonstrated that Ms. Trotter's corpse exhibited obvious decomposition. Early in his first federal action, Swearingen himself admitted that "[t]he body was in an *advanced state of decomposition*, making autopsy conclusions difficult."  (*Swearingen v.*

---

[14]     When the Court of Criminal Appeals refused to allow Swearingen to file a successive habeas application raising same claims now before the Court, one judge wrote a concurrence recognizing the inherent weakness in raising an actual innocence claim without taking into account the whole of the evidence:  "The hallmark of a scientifically sound hypothesis is that it is consistent with, and accounts for, the totality of the known facts."  Assuming the truth of Swearingen's claim, the judge then contrasted it with the weighty evidence against Swearingen. The judge found:

> All of this evidence is wildly inconsistent with the hypothesis that Melissa magically 'disapparated' from the earth for twenty-one days and then reappeared, as if from suspended animation, dead on the floor of the Sam Houston National Forest on December 29th or 30th. . . . When all of the other known facts and evidence are wholly inconsistent with a particular scientific hypothesis, the reasonably objective scientist revisits that original hypothesis, looking for a flaw. Although one does not doubt the honesty and sincerity of these medical examiners, their theory that Melissa did not die until December 29th or 30th because of the relatively intact state of some of her internal organs is flatly contradicted by an incredible wealth of other evidence. They have made no attempt to account for or explain this other evidence or provide an alternate hypothesis.

*Ex parte Swearingen*, 2009 WL 249778, at **7-8 (Tex. Crim. App. 2009) (Cochran, J., concurring).

*Dretke*, Instrument No, 19 at 32) (emphasis added).   Swearingen acknowledged the "*obvious* fact that the body *had certainly been dead for over 72 hours*" because "the autopsy report noted that 'rigor had passed and livor was obscured due to decompositional change[].'" (*Swearingen v. Dretke*, Instrument No, 19 at 32) (emphasis added).   Swearingen has elsewhere agreed that the "autopsy revealed *significant decompositional changes* especially in the head and neck area due to exposure and larval and fungal activity." *Swearingen v. Dretke*, No. 05-70039, Appellant's Brief, at 5 (emphasis added).   Dr. Carter' affidavit does not diminish the force of those statements because, even to the extent that Dr. Carter may now have added to some of her earlier *conclusions*, she did not retract her *observations*.   The record amply supports Dr. Carter's statement in her new affidavit that "[t]he decomposition seen in . . . the external examination, particularly of the head and neck region, was substantial."

Swearingen's more recent affidavits, however, purport to describe a nearly pristine body, unaffected by time or the elements.   Swearingen's experts routinely refer to the corpse as well-preserved.   The description of the corpse in Dr. Carter's autopsy report – which is consistent with photographs in the record – differs significantly from that described by Swearingen's experts.   Clearly, parts of Ms. Trotter's body had reached a later stage of decomposition while other parts showed less decay. The photographic evidence from trial shows a disturbing disunity in the progression of decay and animal damage.   Nearly every affidavit from Swearingen's experts ignores factors most decisively indicating a long period of exposure, such as significant decomposition to the head and neck, the fungal growth observed by Dr. Carter, and the contents of her stomach which still featured the remnants of Ms. Trotter's last meal eaten on December 8, 1998.

For the most part, the expert witnesses have commented on portions of the evidence, but apparently have not considered that evidence as it relates to the condition of the body as a whole.[15]   The experts have looked at a few threads of evidence without considering the whole mosaic.

For the experts' opinions to be credible, clear, or convincing, they must conform to all the evidence. Scientific opinion provides the law with the most assistance when it accounts for the totality of the known facts.   The history of this case provides little confidence that the credibility of Swearingen's experts would hold up when their opinions are compared to all the facts.   At its core, the recently presented histological evidence in Swearingen's latest petition differs little in exculpatory thrust from the entomological evidence that Swearingen relied on in his successive state habeas actions.[16] When confronted in the state habeas hearing with evidence showing significant decomposition, Swearingen's experts floundered.  They could not reconcile their opinion of insect colonization with other facts known about the crime.

One of Swearingen's experts, Dr. Luis Sanchez, testified that "the pattern of the decomposition in this case is a little bit unusual.  It's not what we tend to see in most of our cases, especially with the mold that [Dr. Carter] saw all over her body."  *Ex parte Swearingen*, No. 53,613-04, Evidentiary Hearing at 26.  Looking at all the facts, Dr.

---

[15]    Frustrated with the limited approach taken by the experts in this case, one judge on the Court of Criminal Appeals asked "when did [Ms. Trotter] die?" and answered: "The scientists are all over the board. Theirs is like the Indian tale of the blind men touching the various parts of the elephant and coming to entirely different conclusions about the animal."  *Ex parte Swearingen*, 2009 WL 249778, at 6 (Tex. Crim. App. Jan. 27, 2009) (Cochran, J., concurring).

[16]    The state habeas court held a hearing in Swearingen's second habeas action.   That court specifically considered entomology, and exhibited concerns about delving into the "quality of the pathology report of about any kind of inaccuracies of that report" but stated that "an opinion about how long that body was exposed to the elements, that might be relevant."  *Ex parte Swearingen*, No. 53,613-04, Evidentiary Hearing at 16.  Oddly, Swearingen has relied on Dr. White consistently throughout his numerous actions to challenge the date of death, but did not call him as a witness in that action.

Sanchez would not give an opinion on the date of death, he would only make assumptions about the period of time that Ms. Trotter's body had been exposed to the elements.  He said: "That body most likely was not in that forest for more than two weeks.  *It probably was some place before that*, but not in that forest."  *Ex parte Swearingen*, No. 53,613-04, Evidentiary Hearing at 17 (emphasis added).  Dr. Sanchez could not say that it was impossible for her "to have been murdered on December 8th[.]"  *Ex parte Swearingen*, No. 53,613-04, Evidentiary Hearing at 23.

The other expert Swearingen called to testify, Dr. James Arends, also said: "I do not think this body was in the woods probably more than a week."  *Ex parte Swearingen*, No. 53,613-04, Evidentiary Hearing at 74.[17]  Dr. Arends, however, could not adequately explain why Ms. Trotter's head "is the only part of the body that has any significant parts of decomposition.  That seems really difficult to believe that only the head would decompose when the entire body was laying in the woods the entire time."  *Ex parte Swearingen*, No. 53,613-04, Evidentiary Hearing at 82.  Dr. Arends agreed that there was a "discrepancy between the rates [of] decomposition," noting it was "[f]rom one end of this body to the other[.]"  *Ex parte Swearingen*, No. 53,613-04, Evidentiary Hearing at 82.

With the "significant levels of decomposition" of Ms. Trotter's head, Dr. Arends and Dr. Sanchez created a speculative explanation that does not completely exculpate Swearingen.  Both experts could only reconcile their conclusions by conjecturing that someone froze Ms. Trotter's body and then placed it in the woods – a theory which,

---

[17]    The state habeas court found that Dr. Arends was *not* a credible witness.  *Ex parte Swearingen*, No. 53,613-04, at 527.

though originating with his experts, Swearingen now mocks.[18]  Given their testimony, the state habeas court found that the expert witnesses "did not contradict Dr. Carter's testimony about the degree of fungal development" or "concerning Melissa Trotter's stomach contents."  *Ex parte Swearingen*, No. 53,613-04 at 529.  Swearingen's newly presented affidavits and evidence contain the same evidentiary holes that Dr. Arends and Dr. Sanchez confronted.  The question is how a reasonable jury would respond to that information.

To the limited extent that Swearingen's experts have considered factors showing a longer period of exposure in the woods, they have not fared much better than those who testified in the evidentiary hearing.  For instance, Dr. Pustilnik is the only expert whose affidavit comments on the condition of Ms. Trotter's head.  In direct opposition to the autopsy report, the photographs, and testimony from Dr. Carter, Dr. Sanchez, and Dr. Arends, he attributes all disfigurement on the head and neck to "predatory activity."[19]  Dr. Pustilnik, in essence, found hardly any evidence of decomposition, making his testimony not credible.

Dr. White's April 14, 2009 affidavit comments on fungal growth, but then only to opine that Dr. Carter did not provide enough information about the fungus she observed.

---

[18]   For instance, Swearingen told the Fifth Circuit when moving to file a successive action: "The only way out, for the State, is to imagine an accomplice who preserved the body and threw it in the forest more than a week after Mr. Swearingen was jailed. However, the State itself has never resorted to this rank speculation."  He did not inform the circuit court that his experts, in fact, had resorted to that speculation.  The Court clarifies that it does not adopt the theory that Swearingen murdered Ms. Trotter and then another mysterious individual froze her body and dumped it in the woods.  This Court only observes the fact that Swearingen's experts, and some State actors, have advanced that theory because they cannot come to a scientific conclusion about what happened.  This Court's role in considering the actual innocence claim is not to sanction one theory as what really happened to Ms. Trotter.  This Court's role is to look at Swearingen's claim in light of all the evidence and record.

[19]   Dr. Pustilnik also determines from observing the autopsy photos that Ms. Trotter's stomach contained "whole red meat (not ground meat) and scallions," not the last meal she was seen eating.

Dr. White, in fact, accuses Dr. Carter of ineptitude by incorrectly identifying typical discoloring seen in decomposition as fungal growth. No other expert has questioned Dr. Carter's findings in that regard. In fact, Swearingen's experts in the state evidentiary hearing adopted her observations after they had seen the same photographs. In the isolated instances where Swearingen's experts have mentioned the evidence Dr. Carter relied on to establish a date of death, they have written off, rather than reconciled, her observations. Swearingen's strained attempts at this late date to challenge the previously unquestioned external observations are not credible.

A jury looking at "the evidence as a whole" could not ignore the facts showing that Ms. Trotter's body had been on the forest floor for more than a few hours or days. *See Swearingen*, 556 F.3d at 348 n.6 (noting that the credibility of the expert affidavits suffers from not taking into account evidentiary hearing evidence about secondary colonization by insects and the contents of Ms. Trotter's stomach). Importantly, the jury would have to plug the narrow conclusions made by Swearingen's experts into the broad facts the State adduced which pointed to him as the killer. *See Thompson*, 523 U.S. at 565 (stating that a court cannot "ignore the totality of evidence of . . . guilt" when considering a claim of actual innocence). Examination of the tissues, and the hardly credible testimony that she was in the forest for only a few hours or days, does not conclusively change the manner in which the jury would view the "evidence as a whole." 28 U.S.C. § 2244(b)(2)(B)(ii).

To reiterate, Swearingen was the last person that Ms. Trotter was seen with alive.[20] Ms. Trotter had been in Swearingen's truck, where he forcibly removed hair

---

[20]     Swearingen's briefing makes an effort to discount portions of the evidence against him, largely by making arguments cumulative of evidence the jury rejected. *See In re Martinez*, 2009 WL 585616,

follicles.  Swearingen's histological evidence does not explain why she was in his house that day, why it was later found to be in disarray, and why he falsely claimed that there had been a burglary there.  The evidence itself does not explain why papers belonging to Ms. Trotter were found near the house of Swearingen's parents and her cigarettes were in Swearingen's house.  The new information does not explain why Ms. Trotter was found wearing the same clothes as when she disappeared and why she had a note given to her by a friend on December 8 in her back pocket.  The new evidence does not show why cell phone records traced Swearingen to a location near where Ms. Trotter was found.  Histology does not explain why half of a pair of pantyhose belonging to Swearingen's wife was found in Swearingen's house and the other half around Ms. Trotter's neck.  The new evidence does not explain why the same meal Ms. Trotter was last seen eating was found in her stomach.  Swearingen lied about his whereabouts, tried to fabricate an alibi, made false police reports, fled from the police, asked friends to lie in his behalf, told others that the police would be after him, and crafted an ultimately inculpatory letter to throw attention away from himself.  Swearingen told other inmates, "Fuck, yeah, I did it."  Finally, Swearingen's experts do not explain where Ms. Trotter was from December 8 until a few days before hunters found her body.

---

at *2 (5th Cir. 2009) (refusing to find actual innocence based on matters that the jury had already considered).  Swearingen also attempts to characterize as weak the evidence that he killed Ms. Trotter.  As this Court found in the first federal habeas action, "the trial evidence supported rather strongly a finding that Swearingen caused Ms. Trotter's death, [though]] the generally circumstantial evidence becomes less convincing with respect to the predicate offenses of kidnapping and aggravated sexual assault. (*Swearingen v. Dretke*, No. 04-cv-2058, Instrument No. 39 at 24).  Concerns over the strength of the evidence surfaced early on as to the predicate offenses, but the circumstantial evidence showing his identity as the murderer was not nearly as tenuous as Swearingen now argues it was. *See Swearingen*, 101 S.W.3d at 96 (noting that the "evidence supporting the findings of *kidnapping or sexual assault* might appear weak and tentative when viewed in isolation") (emphasis added).  When referring to the integrity of his identity as the murderer, the Texas state courts have noted the "substantial amount of circumstantial evidence of [Swearingen's] guilt." *Ex parte Swearingen*, No. 53,613-04, at 538.

This is not to say that the new evidence would have been disregarded by trial counsel. In fact, the evidence could possibly help create a stronger defense. *See Herrera v. Collins*, 506 U.S. 390, 418-19 (1993) ("This is not to say that petitioner's affidavits are without probative value[.]"); *Keith v. Bobby*, 551 F.3d 555, 559 (6th Cir. 2009) (finding that, even if new evidence inserts some questions into the proceedings, that is not the same as "clear and convincing evidence" or dealing a "fatal blow"). But Swearingen has not shown harmony between Dr. Carter's autopsy observations, the trial record, and his new evidence. Likely, some other piece of the puzzle is still missing. The state courts which have considered Swearingen's claims have, both in written orders and in oral questioning, hinted that conditions on the forest floor in 1998-99 could have been cooler and wetter than reported elsewhere. Swearingen dumped his victim in a shady, moist forest. Perhaps the cool and dank conditions of her precise location slowed the internal process of decomposition – a theory consistent with Dr. Carter's autopsy description of her body as "cool and damp."

But this Court's duty is not to neatly decide which theory, if any, is more correct. This is especially the case on habeas review where the presumption of innocence has run its course and principles of comity, federalism, and finality of judgments lean steeply in favor of upholding the verdict. Congress has tethered this Court's analysis to how a reasonable juror would view the whole of the evidence as it was at trial and as it is now. A jury considering Swearingen's new evidence would weigh it against the evidence showing his involvement in Ms. Trotter's murder. In the end, the jury would likely consider the whole of the new scientific evidence in the context of the opinion of Swearingen's expert at trial: "The definition of the time of death is probably the most

challenging question for a pathologist. A pathologist can only provide some gross parameters, but the reality is that the answer is one of the least dependable answers that a pathologist can provide in regards to what he knows about death." Tr. Vol. 31 at 71-72. The conflicted and incomplete scientific evidence does not make the suggestion that Ms. Trotter had only been dead two or three days a credible hypothesis for a reasonable juror considering all the evidence.

This is not a case where Swearingen's evidence is so compelling that a court cannot have confidence in the outcome of his trial. Thus, Swearingen has not met his burden of showing that "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2244(b)(2)(B)(ii).

## V.   Conclusion

This Court has reviewed Swearingen's briefing and evidence under the AEDPA standards. In doing so, this Court's role has not been to substitute its own view of the evidence, blindly adhere to the circuit court's tentative finding, or speculate as to what effect one piece of evidence would have made independent of all other factors. The Court emphasizes that the statutory charge has guided the review. The Court has not and could not engage in any adjudication of the merits which are currently beyond this Court's jurisdiction.

The AEDPA places a heavy duty, independent of the Fifth Circuit's initial review, on an inmate to prove conclusively whether he meets the strict standards enacted by Congress. Swearingen has simply not shown that this Court possesses any authority to

consider the merits of his claims.  *See In re McGinn*, 213 F.3d 884, 885 (5th Cir. 2000) ("We do not suggest that in striving to both convict the guilty and free the innocent, criminal process can look away from exculpatory evidence with such potential explanatory power. Rather, we remind that this is a court of limited jurisdiction, only part of an entire system. We are persuaded that Congress has withheld jurisdiction from this court to grant the requested relief here.").  The AEDPA *requires* this Court to **DISMISS** Swearignen's successive habeas petition.

In light of the complex record, but noting this Court's confidence in its resolution of this action, the Court will grant Swearingen a Certificate of Appealability because these matters deserve appellate consideration.  *See* 28 U.S.C. § 2253(c); FED.R.APP.P. Rule 22(b); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (allowing a COA to issue when the claims "presented were adequate to deserve encouragement to proceed further.").

SIGNED at Houston, Texas, this 18th day of November, 2009.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE