IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LARRY RAY SWEARINGEN, § | | |
|     Petitioner, § | | |
| § | | |
| v. § | | NO. 4:09-CV-0300 |
| § | | |
| LORIE DAVIS, Director, § | | |
| Texas Department of Criminal Justice, § | | |
| Correctional Institutions Division, § | | |
|     Respondent's. § | | |

# RESPONDENT'S RESPONSE IN OPPOSITION TO PETITIONER'S REQUEST FOR FUNDING FOR EXPERT ASSISTANCE UNDER 18 U.S.C. §3599(e)

Petitioner Larry Ray Swearingen is a Texas state inmate who unsuccessfully sought federal habeas relief under 28 U.S.C. § 2254 from his capital murder conviction and death sentence. The state trial court set Swearingen's execution for August 21, 2019. Swearingen now seeks funding pursuant to 18 U.S.C. § 3599(e) and (f), for "an expert with specialized knowledge in cell phone technology and tracking to assistant Petitioner with the development and presentation of habeas claims in state court proceedings… ." ECF No. 49 at 1. For the reasons set out below, the Director opposes his funding request.

## I. Federal Funding is Not Justified for State Prisoner's Pursuit of Relief in a Subsequent State Writ Application.

Supreme Court precedent precludes Swearingen's request here. He seeks funding for expert assistance to facilitate the filing of a subsequent state writ application pursuant to Article 11.073 of the Texas Code of Criminal Procedure. He claims that *Harbison v. Bell*, 566 U.S. 180 (2009), authorizes funding under 18 U.S.C. §3599(e) for subsequent state proceedings, including those filed pursuant to Article 11.073. ECF No. 49 at 11. Despite acknowledging that *Harbison* explicitly rejected the notion that §3599(e) permits federal funding for state habeas proceedings, Swearingen nevertheless insists this case supports his funding request. It does not.

*Harbison* held that "§3599 authorizes federally appointed counsel to represent their clients in state clemency proceedings and entitles them to compensation for that representation." 556 U.S. at 194. The Court reasoned that the statute's directive that counsel "shall represent the defendant throughout every subsequent state of the available judicial proceedings, including … all available post–conviction process" contemplated that counsel's representation would continue to "those judicial proceedings transpiring 'subsequent' to her appointment." *Id*. at 188. The Court made clear, however, that its holding was limited and dictated by the plain language of the statute. *Id*. at 185,188–190. Specifically, in response to the Government's concern that

2

authorizing appointed counsel for state clemency proceedings would require federally funded counsel to represent a client in any state habeas proceedings occurring after counsel's appointment, the Court responded:

> But, as we've previously noted, subsection (c) authorizes counsel to represent her client in "subsequent" stages of available judicial proceedings. State habeas is not a stage "subsequent" to federal habeas. Just the opposite: Petitioner's must exhaust their claims in state court before seeking federal habeas relief. That state post–conviction litigation sometimes follows the initiation of federal habeas because a petitioner has failed to exhaust does not change the order of proceedings contemplated by the statute."

*Id.* at 189–90 (internal citations omitted).

Swearingen claims that *Harbison*'s restriction on the appointment of, and funding for, counsel in state habeas proceedings does not apply here because "Article 11.073 is not a vehicle for raising federal constitutional causes of action," and claims brought under this statute are not "subject to federal exhaustion requirements." ECF No. 49 at 11. He further contends that, because exhaustion is not required for the relief proscribed in Article 11.073, it is "akin to state clemency proceedings" for which *Harbison* authorizes funding under § 3599. He is wrong for two reasons.

First, relief afforded under Article 11.073 is clearly a post–conviction writ of habeas corpus—not clemency. As explained by the Texas Court of Criminal Appeals in *Ex parte Robinson*:

> Article 11.073 was enacted on September 1, 2013 … . Prior to the enactment of article 11.073, newly available scientific evidence *per*

3

> *se* generally was not recognized as a basis for habeas corpus relief and could not have been reasonably formulated from a final decision of this Court or the United States Supreme Court, unless it supported a claim of "actual innocence" or "false testimony."
>
> Article 11.073 provides a new legal basis for habeas relief in the small number of cases where the applicant can show by the preponderance of the evidence that he or she would not have been convicted if the newly available scientific evidence had been presented at trial.

478 S.W. 3d 678, 690 (2014). Indeed, to succeed under Article 11.073, Swearingen must file a state writ application under Texas's post–conviction habeas statute for death penalty cases, Article 11.071. *See* Tex. Crim. App. art. 11.073 (b)(1). That relief under Article 11.073 is grounded in state, rather than federal constitutional, changes nothing. It is a post–conviction state habeas proceeding for which *Harbison* holds federal funds are not available.

Second, the absence of an exhaustion requirement does not render state writ applications filed pursuant to Article 11.073 "subsequent" or "akin to clemency" for purposes of federal funding. *Harbison* could not be clearer that "[s]tate habeas is not a stage 'subsequent' to federal habeas" for purposes of funding under §3599(e). *Harbison*, 556 U.S. at 189. This holding is not predicated or dependent on actual temporal order of events in a particular case, but on the "order of proceedings contemplated by the statute." *Id*. at 190. As noted by the Court in *Harbison*, §3599(e) was organized "to mirror the ordinary course of proceedings for capital defendants." *Id*. at 188. The Court's reference

4

to the exhaustion requirement—which Swearingen relies upon in an attempt to formulate a loophole circumventing the inapplicability of §3599 to state habeas proceedings—was not the basis for its ruling, but a notation of the typical order of proceedings. Indeed, the Court went so far as to note that an inversion of the natural order due to the failure to exhaust "does not change the order of proceedings contemplated by the statute" or render them "subsequent" for purposes of federal funding. *Id*. at 189–90. Thus, the fact that Swearingen's Article 11.073 application, when filed, would occur subsequent in time to the completion of his federal habeas proceedings does not bring it under §3599's purview.

Furthermore, unlike clemency, which is typically "subsequent" to the the completion of the federal habeas proceedings, Article 11.073 contemplates that claims based newly discovered scientific evidence be presented at the earliest possible moment in the post-conviction proceedings—even in the original application, if discoverable then. Applicants are still required to satisfy the Texas abuse-of-the-writ bar set out in Article 11.071 § 5, if the Article 11.073 claim is not asserted in the original petition. *See* Tex. Code. Crim. Proc. art. 11.073(c). Accordingly, Swearingen's attempt to liken proceedings arising under Article 11.073 to clemency fails.

5

Swearingen's attempt to expand the Supreme Court's holding in *Harbison* is not sustainable. Federal funds are simply not available to state court prisoners pursuing relief in a subsequent state writ application. As such, this Court should deny Swearingen's request to fund his cell phone expert.

## II. Regardless, Swearingen Cannot Demonstrate the Reasonable Necessity of the Requested Funds as Required by the Statute.

Even assuming that federal funds were available for state habeas proceedings, there is no justification to authorize them here. Under the statute, funding for expert assistance is permitted only where the petitioner demonstrates that the "services are reasonably necessary for the representation of the defendant." 18 U.S.C. § 3599(f). The Supreme Court recently explained in *Ayestas v. Davis*, that "[a] natural consideration informing the exercise of [the district court's] discretion is the likelihood that the contemplated services will help the applicant win relief." 138 S.Ct. 1080, 1094. To that end,

> [p]roper application of the "reasonably necessary" standard thus requires courts to consider the potential merits of the claims that the applicant wants to pursue, the likelihood that the services will generate useful and admissible evidence, and the prospect that the applicant will be able to clear any procedural hurdles standing in the way.

*Id.* Swearingen's bid for funding falls short because he fails to establish that that there is any likelihood that he would succeed on the merits of his claim.

6

To succeed under Article 11.073, Swearing must demonstrate: (1) "relevant scientific evidence is currently available and was not available at the time of the [his]trial because the evidence was not ascertainable through the exercise of reasonable diligence by [him] before the date of or during the [his]trial;" (2) "the scientific evidence would be admissible under the Texas Rules of Evidence at a trial held on the date of the application;" and (3) "had the scientific evidence been presented at trial, on the preponderance of the evidence [he] would not have been convicted." Tex. Code. Crim. Proc. art. 11.073(b)(1)(A)&(B).

Initially, Swearingen fails to establish here that the "new" scientific evidence upon which he relies was not ascertainable at the time of trial. He merely asserts, in conclusory fashion that the theory and date relied upon by the State's expert was "invalid" and is "no longer accepted by experts in the field." ECF No. 49 at 21. He then cites three anticipated conclusions by his expert that refer to the state's evidence as "false and anachronistic," as well as "discredited and disallowed in federal courts." ECF No. 49 at 22. But there are no citations to caselaw or peer reviewed scientific literature establishing when the information that establishes the basis for his expert's opinion refuting the State's evidence became available.[1] Even assuming the state's evidence was

---

[1] The expert's preliminary report, Exhibit 4, was filed under seal. The Director objects to not being served with a copy of the report that provides the basis for the

7

anachronistic and discredited—a fact that Director does not concede—Article 11.073 provides no relief for Swearingen that evidence supporting this fact was available through due diligence at the time of trial.

More importantly, however, even assuming Swearingen could demonstrate that his cell phone evidence was not available at the time of his trial, he is wholly unable to meet the Article 11.073's requirement of proving by a preponderance of the evidence that he would not have been convicted in light of the new evidence. Notably, this is not the first time that Swearingen has attempted to convince a court that new scientific evidence will establish his innocence. *See Swearingen v. Thaler*, 2009 WL 4433221 (S.D. Tex. Nov. 18, 2009) (setting out Swearingen's previous attempts to prove his innocence leading up to his 2009 execution date)[2]. Yet, in each instance the courts—including this one—have held that the "mountain of inculpatory evidence" demonstrating Swearingen's guilt precludes any such finding.[3] This mountain

---

Swearingen's request for funding, thus hindering her ability to fully and accurately respond to the present motion.

[2]     *See also State v. Swearingen*, 478 S.W.3d 716 (Tex. Crim. App. 2015) (holding that Swearingen not entitled to DNA testimony under Chapter 64 of Texas Code of Criminal Procedure because he could not demonstrate by a preponderance of the evidence that he would not have been convicted in light of "exculpatory results" to the DNA testing); *Swearingen v. State*, 303 S.W.3d 728 (2010) (same).

[3]     *See Ex parte Swearingen*, 2009 WL 249778; *Swearingen v.* Thaler, 2009 WL 4433221; *Swearingen v. Thaler,* 421 Fed.Appx. 413 (5th Cir. 2001); *see also* note 2, *supra.*

of inculpatory evidence that impeded Swearingen's attempt to prove his innocence, also prevents him from establishing, by a preponderance of the evidence, that the jury would not have convicted him had he been able to refute the State's cell phone evidence at trial.

As set out by the CCA in denying Swearingen request for DNA testimony in 2010, the trial court made "supported–by–the–record" findings of fact that "underscore the substantial evidence of [Swearingen's] guilt." *Swearingen v. State*, 303 S.W.3d 728, 737 (Tex. Crim. App. 2010). These findings include:

- On the evening of December 7, 1998, two of [Swearingen]'s acquaintances, the Fosters, witnessed a phone conversation in which [Swearingen] arranged for a lunch meeting with a girl at a library the following day, and [Swearingen] then told the Fosters that the girl was Melissa Trotter, a college student from Willis.

- Three witnesses saw [Swearingen] sitting with Melissa in the Montgomery College library between 11:30 a.m. and 1:30 p.m. the following day, December 8, 1998.

- Melissa's Biology teacher saw Melissa leave the Montgomery College library with a male shortly after 1:30 p.m. that day.

- Melissa's car remained in the Montgomery College parking lot following her disappearance on December 8, 1998.

- At 2:05 p.m. on December 8, 1998, [Swearingen] called Sarah Searle and said that he was at lunch with a friend.

- Sometime around 3:00 p.m. on December 8, 1998, [Swearingen]'s landlord saw Applicant's truck leaving from behind his home.[4]

- [Swearingen]'s wife testified that she found their home in disarray on the evening of December 8, 1998, but none of the Swearingen's property was missing.

- [Swearingen]'s wife observed Melissa's cigarettes and lighter in [Swearingen]'s house that evening, and those items were subsequently recovered from [Swearingen]'s home during the investigation.

- Hair and fiber evidence, as well as other physical evidence, showed that Melissa had been in [Swearingen]'s car and his home on the day of her disappearance.

- [Swearingen] filed a burglary report falsely claiming that he had been out of town and his home was broken into on the day of Melissa's disappearance.

- Between the time of Melissa's disappearance and [Swearingen]'s arrest, [Swearingen] told two acquaintances on two different occasions that he believed police would be after him.

- When the Fosters heard that Melissa Trotter was missing on December 9, 1998, they contacted [Swearingen], who claimed he did not remember the last name of the girl with whom he had met the day before.

---

[4] The following finding by the trial court was omitted as it the evidence at issue here: "At 3:03 p.m. on December 8, 1998, [Swearingen] placed a cell phone call that utilized a cell tower near FM 1097 in Willis, Texas, which would be consistent with [Swearingen] driving from his home to the Sam Houston National Forest."

10

- When Mrs. Foster told [Swearingen] that she recalled him saying the last name was "Trotter," and that a girl named Melissa Trotter was now missing, the phone went dead.

- [Swearingen] led a Sheriff's deputy on a high speed chase.

- Following [Swearingen]'s arrest, law enforcement authorities observed and photographed red marks on [Swearingen]'s neck, cheek, and back.

- On December 17, 1998, two neighbors of [Swearingen]'s mother and stepfather collected numerous pieces of torn paper from along their street, which turned out to be Melissa Trotter's class schedule and some health insurance paper work Melissa's father had given to her.

- Melissa's body was discovered in an area of the Sam Houston National Forest with which [Swearingen] would have been familiar from previous time spent there.

- Melissa's body showed signs of significant decomposition when it was discovered in the woods 25 days after her disappearance.

- The ligature found around Melissa's neck matched the remainder of a pair of pantyhose found within [Swearingen]'s home.

- The Harris Country Chief Medical Examiner testified that during the digestive process, a person's stomach will usually not empty in less than two hours, and any food within the stomach at death will remain there.

- The contents of Melissa's stomach at the autopsy, which included what appeared to be chicken and a french fry-like form of potato, were consistent with the tater tots she had eaten at Montgomery College shortly before leaving with [Swearingen] and the Chicken McNuggets she and

11

> [Swearingen] had apparently purchased at the nearby McDonald's on the day of her disappearance.
>
> - While in jail, [Swearingen] attempted to create an exculpatory letter written in Spanish in which he claimed to be someone else who had knowledge of Melissa's murder.
>
> - Within that letter, [Swearingen] detailed specifics of the offense that accurately corroborated the physical and medical evidence in the case.
>
> - While in jail awaiting trial, [Swearingen] told a cell mate that he had committed the capital murder and his only objective was to escape the death penalty.

*Id.* at 737–38.

In the present motion, Swearingen vastly overstates the significance of the inculpatory nature of the cell phone testimony. To support his insistence on its importance, he relies on a statement in Judge Cochran's concurrence to the CCA's dismissal of Swearingen's eighth state writ identifying the cell phone records showing applicant used his cell phone at 3:03pm on the afternoon of Trotter's disappearance near the cell phone tower on FM 1097—a location that "is directly on the logical path to Sam Houston national Forest where Melissa's body was found three weeks later"—as one of the two most inculpatory pieces of evidence against him. *Ex parte Swearingen*, 2009 WL 249778 *4 (Tex. Crim. App. Jan. 27, 2009)(Cochran, J., concurring). But Judge Cochran's assessment is not conclusive.

Initially, the fact that Judge Cochran identified the cell phone evidence as one of the two most inculpatory pieces of evidence amidst what she referred to as a "veritable forest of inculpatory evidence" does not signify that Swearingen would not have been convicted absent this evidence. Indeed, to reprise what this Court stated in its 2009 opinion regarding the histological evidence Swearingen was proffering then to prove his innocence:

> …Swearingen was the last person that Ms. Trotter was seen with alive. Ms. Trotter had been in Swearingen's truck, where he forcibly removed hair follicles. Swearingen's [cell phone] evidence does not explain why she was in his house that day, why it was later found to be in disarray, and why he falsely claimed that there had been a burglary there. The [cell phone] evidence itself does not explain why papers belonging to Ms. Trotter were found near the house of Swearingen's parents and her cigarettes were in Swearingen's house. The new information does not explain why Ms. Trotter was found wearing the same clothes as when she disappeared and why she had a note given to her by a friend on December 8 in her back pocket. …[The new cell phone evidence] does not explain why half of a pair of pantyhose belonging to Swearingen's wife was found in Swearingen's house and the other half around Ms. Trotter's neck. The new evidence does not explain why the same meal Ms. Trotter was last seen eating was found in her stomach. Swearingen lied about his whereabouts, tried to fabricate an alibi, made false police reports, fled from the police, asked friends to lie in his behalf, told others that the police would be after him, and crafted an ultimately inculpatory letter to throw attention away from himself. Swearingen told other inmates, "Fuck, yeah, I did it."

*Swearingen v. Thaler*, 2009 WL 4433221 * 23.

13

There is simply too much evidence in this case pointing to Swearingen's guilt for him to succeed under Article 11.073. To continue Judge Cochran's analogy, even chopping down an entire tree—by refuting the State's cell phone evidence—among this "veritable forest of inculpatory evidence" is not enough here. *Ex parte Swearingen*, 2009 WL 249778 *1 (characterizing Swearingen's efforts to prove his innocence based on new DNA and other scientific evidence as "focusing solely on a couple of twigs of apparently exculpatory evidence instead of the veritable forest of inculpatory evidence.")

Because he fails to demonstrate any likelihood that he will succeed on the merits of his Article 11.073 claim, Swearingen cannot demonstrate that the funds he requests are reasonably necessary as set out under § 3599(e). As such, there is no basis upon which to grant his motion.

## CONCLUSION

For the reasons set out above, the Director respectfully requests that this Court deny Swearingen's motion to authorize federal funds for expert assistance to support a subsequent state writ application.

Respectfully submitted,

JEFFREY C. MATEER
First Assistant Attorney General


ADRIENNE MCFARLAND
Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

*s/ Tina J. Miranda*
TINA J. MIRANDA
Assistant Attorney General
Texas Bar No. 24026139
Southern District Bar No. 27728

Office of the Attorney General
Criminal Appeals Division
P. O. Box 12548, Capitol Station
Austin, Texas 78711-2548
tina.miranda@oag.texas.gov
Telephone: (512) 936-1600
Facsimile: (512) 320-8132

ATTORNEYS FOR RESPONDENT

**CERTIFICATE OF SERVICE**

I hereby certify that on May 13, 2019, I electronically filed the foregoing document with the clerk of the court for the United States District Court, Southern District of Texas, using the electronic filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the following attorney of record who has consented in writing to accept this Notice as service of this document by electronic means:

James G. Rytting
HILDER & ASSOCIATES, P.C.
james@hilderlaw.com
819 Lovett Boulevard
Houston, TX 77006
(713) 655-9111

                                              *s/ Tina J. Miranda*
                                              TINA J. MIRANDA