United States District Court
Southern District of Texas
**ENTERED**
June 12, 2019
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LARRY RAY SWEARINGEN, | § | |
| | § | |
| Petitioner, | § | |
| VS. | § | CIVIL ACTION NO. 4:09-CV-300 |
| | § | |
| LORIE DAVIS, | § | |
| | § | |
| Respondent. | § | |

## ORDER

Larry Ray Swearingen has been on Texas death row since 2000 for the capital murder of eighteen-year-old Melissa Trotter. After the state courts denied Swearingen's direct appeal and initial state habeas action, this Court denied a federal habeas petition in 2005. In the years since, Swearingen has aggressively litigated various challenges to his conviction, including numerous habeas petitions and civil rights actions in both state and federal court.

The State of Texas has set an execution date of August 21, 2019. No litigation that would postpone Swearingen's execution is currently pending in state or federal court. Swearingen has now filed an Opposed Motion and Brief, Pursuant to 18 U.S.C. §3599(e), for Funding for an Expert in Cell Phone Technology and Tracking. (Doc. No. 49). Swearingen asks this Court to allocate funds "for the development and presentation of habeas claims in state court proceedings . . . ." (Doc. No. 49 at 1). Respondent Lorie Davis opposes Swearingen's motion. Adjudication of Swearingen's motion requires the Court to decide: (1) whether federal law authorizes Swearingen's federal habeas attorney to represent him in another state challenge to his conviction and (2) whether the allocation of funds is reasonably necessary to retain an expert in cell phone technology.

For the reasons discussed below, the Court will deny Swearingen's motion.

I.   **Background**

On the evening of December 7, 1998, Swearingen arranged to meet Melissa Trotter, a college student from Willis, in the Montgomery College library the next day. Witnesses saw the two on campus the following day. Ms. Trotter was never seen again.

On January 2, 1999, hunters found Ms. Trotter's decomposing body in a heavily wooded portion of Sam Houston National Forest. The medical examiner determined that Ms. Trotter had been asphyxiated by a piece of nylon hosiery tied around her neck.

No one witnessed Ms. Trotter's kidnapping, sexual assault, or murder. Circumstantial evidence, however, strongly inculpated Swearingen in the crime. The State based its case against Swearingen on what the Texas Court of Criminal Appeals has repeatedly called a "mountain of inculpatory evidence." *State v. Swearingen*, 478 S.W.3d 716, 722 (Tex. Crim. App. 2015); *State v. Swearingen*, 424 S.W.3d 32, 39 (Tex. Crim. App. 2014); *Swearingen v. State*, 303 S.W.3d 728, 736 (Tex. Crim. App. 2010). The State put this evidence into context using a time line of Swearingen's movements on December 8, 1998. The State argued that Swearingen (1) met Ms. Trotter at the college; (2) left with her at around 2:00 p.m. and possibly stopped at a nearby McDonald's restaurant to purchase chicken nuggets; (3) traveled north to his home; (4) left around 3:00 p.m. for the location where her body was found in the woods; and (5) was seen leaving his home again sometime after 4:00 p.m. *See Swearingen v. Dretke*, H-04-CV-2058 (S.D. Tex.) (Doc. No. 25 at 5-6) (summarizing trial testimony).

The State's time line, however, was not the only version of events that came before the jury. In closing arguments, the prosecutor reminded jurors: "We have basically two different stories going on in this situation. We have all this evidence and we have [Swearingen's] story." Tr. Vol. 34 at

2

28. The defense encouraged jurors to find that Swearingen's movements on December 8 excluded him from being the killer. Tr. Vol. 34 at 45-48. As one feature of the defense's time line, Swearingen provided narrative testimony that reiterated portions of the account he provided in his police statement. Tr. Vol. 33 at 133-42; *see also* Tr. Vol. 25 at 224, State's Exhibit 58. In that account, Swearingen (1) admitted meeting Ms. Trotter at the college, Tr. Vol. 25 at 127; (2) claimed that he left the college without her and then traveled south, arriving at Cavender's Boot City on F.M. 1960 at around 2:00 p.m., Tr. Vol. 25 at 128-29; Tr. Vol. 32 at 56; and (3) said that he then drove north and was stuck in traffic on the freeway at about 3:00 p.m. Tr. Vol. 32 at 62.

The State adduced testimony and evidence that contradicted Swearingen's version of events. As recounted in an earlier Memorandum and Order, trial testimony confirmed that Swearingen met Ms. Trotter at Montgomery College on the afternoon of December 8, 1998:

- On the evening of December 7, 1998, two of [Swearingen's] acquaintances, the Fosters, witnessed a phone conversation in which [Swearingen] arranged for a lunch meeting with a girl at a library the following day, and [Swearingen] then told the Fosters that the girl was Melissa Trotter, a college student from Willis;

- Three witnesses saw [Swearingen] sitting with Melissa in the Montgomery College library between 11:30 a.m. and 1:30 p.m. on December 8, 1998;

- Melissa's Biology teacher saw Melissa leave the Montgomery College library with a male shortly after 1:30 p.m.;

- Melissa's car remained in the Montgomery College parking lot following her disappearance on December 8, 1998 . . . .

(Doc. No. 36 at 4).[1]

---

[1] With some slight alteration, courts have repeatedly relied on a detailed outline of inculpatory facts that established Swearingen's guilt. *State v. Swearingen*, 478 S.W.3d 716, 718 (Tex. Crim. App. 2015); *State v. Swearingen*, 424 S.W.3d 32, 34 (Tex. Crim. App. 2014); (continued...)

3

The State relied on expert testimony to contradict Swearingen's testimony about driving south to Cavender's Boot City at around 2:00 p.m. According to an expert witness, a cell phone antenna just north of the college picked up calls from Swearingen's cell phone proving that he was still nearby between 2:00 and 2:09 p.m. Tr. Vol. 27 at 66. But that was not the only testimony contracting Swearingen's version of events. The State provided a receipt from Cavender's Boot City showing that Swearigen had purchased items there in the morning of December 8, 1998. With that evidence, Swearingen admitted on cross-examination that he had lied about traveling south after meeting Ms. Trotter. Tr. Vol. 32 at 56.

The State accounted for Swearingen's movements after leaving the college through testimony and evidence. The State argued that, after 2:00 p.m., Swearingen drove north to his house in Willis, Texas. Trial testimony confirmed Ms. Trotter's presence in Swearingen's truck and house:

- At 2:05 p.m. on December 8, 1998, [Swearingen] called Sarah Searle and said that he was at lunch with a friend;

  . . .

- [Swearingen's] wife testified that she found their home in disarray on the evening of December 8, 1998, but none of the Swearingen's property was missing;
- [Swearingen's] wife observed Melissa's cigarettes and lighter in [Swearingen's] home that evening, and those items were subsequently recovered from [Swearingen's] home during the investigation;

  . . .

- On December 17, 1998, two neighbors of [Swearingen's] mother and stepfather collected numerous pieces of torn paper from along their street, which turned out to be Melissa Trotter's class schedule and some health insurance paper work Melissa's father had given to her;

  . . .

---

[1] (...continued)
*Swearingen v. State*, 303 S.W.3d 728, 737 (Tex. Crim. App. 2010); *Swearingen v. Thaler*, 2009 WL 4433221, at *2 (S.D. Tex. 2009); *Ex parte Swearingen*, Nos. WR-53,613-08, WR-53,613-09, 2009 WL 249759, at *2 (Tex. Crim. App. 2009) (Cochran, J., concurring). For simplicity's sake, the Court will quote from that outline as it appeared in an earlier Memorandum and Order in this case.

- There were numerous cross-matches of fibers, hairs, and paint between Melissa's body and clothing and [Swearingen's] jacket, master bedroom, and truck;
- Two of Melissa's hairs that were recovered from [Swearingen's] truck still contained the anagen root, indicating they had been forcibly removed from Melissa's head;
- A Luminal test on the seats of [Swearingen's] truck indicated that they had been wiped down with Armor All, and two empty containers of Armor All wipes were found in the garbage at [Swearingen's] home . . . .

(Doc. No. 36 at 3).

The State argued that, after taking Ms. Trotter to his home, Swearingen assaulted her, killed her, and abandoned her body in the woods. A neighbor testified that he saw Swearingen's truck leaving his home at around 3:00 p.m and then leave again after 4:00 p.m. Tr. Vol. 26 at 12-13, 16, 21-23. Swearingen arrived at his step-father's house soon thereafter. Tr. Vol. 26 at 166, 182-83.

Trial testimony, however, left a gap in the State's time line: Swearingen's movements between about 3:00 p.m. and around 4:30 p.m. The State filled that gap with cell phone records: "[a]t 3:03 p.m. on December 8, 1998, [Swearingen] placed a cell phone call that utilized a cell tower near FM 1097 in Willis, Texas, which would be consistent with [Swearingen] driving from his home to the Sam Houston National Forest." *Swearingen*, 478 S.W.3d at 718. But the cell phone evidence was not the only evidence showing that Swearingen had traveled to leave Ms. Trotter's body in the remote woods:

- Melissa's body was discovered in an area of the Sam Houston National Forest with which [Swearingen] would have been familiar from previous time spent there;
- The ligature used to asphyxiate Melissa was a single leg torn from a pair of panty hose belonging to [Swearingen's] wife, the remainder of which was recovered from [Swearingen's] home during the investigation;
- The Harris County Chief Medical Examiner testified that during the digestive process, a person's stomach will usually not empty in less than two hours, and any food within the stomach at death will remain there;

5

- The contents of Melissa's stomach at the autopsy, which included what appeared to be chicken and a french fry-like form of potato, were consistent with the tater tots she had eaten at Montgomery College shortly before leaving with [Swearingen] and the Chicken McNuggets she and [Swearingen] had apparently purchased at the nearby McDonald's on December 8, 1998;
- Based on the state of decomposition of Melissa Trotter's body, including the presence of fungi that take "several weeks' time" to develop, the Harris County Chief Medical Examiner estimated Melissa Trotter's death to have occurred twenty-five days prior to the discovery of her corpse, which is consistent with December 8, 1998;
- A note that had been given to Melissa by another student on the morning of December 8, 1998, was found in a pocket of Melissa's jeans during the autopsy . . . .

(Doc. No. 36 at 6-7).

Independent of any sequence of events on December 8, 1998, other evidence strongly showed that Swearingen was the killer:

- [Swearingen] contacted police that evening and reported an alleged burglary of his home, at which time he falsely claimed to have been out of town from 11:00 a.m. on December 7, 1998, through 7:30 p.m. on December 8, 1998, and also falsely claimed that someone had stolen his VCR and jet ski;
- There was no sign of any prying mechanism having been used on the door to [Swearingen's] home, and his jet ski was subsequently found at a repair shop where [Swearingen] had dropped it off for maintenance prior to Melissa's disappearance;
- [Swearingen] called an ex-girlfriend on the evening of December 8, 1998, and told her that he was in trouble and that the police might be after him;
- When the Fosters heard that Melissa Trotter was missing on December 9, 1998, they contacted [Swearingen], who claimed he did not remember the last name of the girl with whom he had met the day before;
- When Mrs. Foster then told [Swearingen] that she recalled him saying the last name "Trotter," and that a girl named Melissa Trotter was now missing, the phone went dead;
- On December 11, 1998, [Swearingen] told an acquaintance that he anticipated being arrested by Montgomery County authorities;
- Later in the day on December 11, 1998, after [Swearingen] observed an officer radio in his truck's license plate number, [Swearingen] sped away and led the officer on a high speed chase that ended in front of the home of [Swearingen's] mother and stepfather;
- [Swearingen] was arrested on several outstanding warrants following the

6

- high-speed chase, at which time he asked that his hands be placed in front of him rather than behind because his arm and ribs were sore;
- Following [Swearingen's] arrest, law enforcement authorities observed and photographed red marks on [Swearingen's] neck, cheek, and back;

. . .

- When [Swearingen's] good friend, Elyese Ripley, visited him in jail on January 9, 1999, [Swearingen] asked her to lie and say that she had been with him on the day Melissa disappeared and that they had gone to the Texaco-McDonald's near Montgomery College;
- Around early May of 1999, [Swearingen] fabricated a purportedly anonymous exculpatory letter that described the murder with explicit details that were confirmed by investigators, the medical examiner, and [Swearingen's] own medical expert, including the facts that Melissa was injured on the left side of her face, her neck was cut, one of her shoes had fallen off, she was laid among the bushes on her back, and she was wearing red underwear;
- Later in May of 1999, [Swearingen] was asked by a cell mate whether he had committed the murder and [Swearingen] replied, "Fuck, yeah, I did it," and stated that he was just trying to avoid the death penalty.

(Doc. No. 36 at 5-7).

With that testimony and evidence, the jury found Swearingen guilty of capital murder.

## II. Motion for Funds for Expert Assistance and Counsel's Duty to Represent Him in Additional State Court Proceedings

Over the past nineteen years, Swearingen has brought numerous challenges to the State's case against him. As observed years ago, "[s]ince the finality of his conviction, Swearingen has filed a convoluted tangle of habeas applications, *pro se* motions, mandamus actions, and amended pleadings. Throughout, Swearingen has tried to cast doubt on various aspects of the trial evidence against him." (Doc. No. 36 at 11). Swearingen has since litigated various actions in federal and state court. For the purposes of the current litigation, however, the Court does not need to review the prior challenges in detail other than to reiterate that Swearingen has filed civil-rights lawsuits, mandamus actions, at least five state court motions for DNA testing, at least eleven state habeas applications, and successive federal habeas petitions. Swearingen's challenges have traveled

7

different directions: attacking DNA evidence used at trial, seeking testing of other biological material, questioning trial testimony from the medical examiner about the condition of the victim's corpse, championing a different date of death based on microscopic histological tissue from the autopsy, and relying on entomological testimony about the maturity of insects found on Ms. Trotter's body. Even though "Swearingen's challenges have taken evolving and overlapping paths, . . . no court to this point has seriously questioned the integrity of his conviction." (Doc. No. 36 at 11).

Now, Swearingen moves for funding, in the amount of $5,000, to retain an expert with specialized knowledge of cell phones and cell phone technology. (Doc. No. 49). Swearingen has obtained a preliminary report from Cherry Biometrics, attached to his motion as a sealed exhibit. Swearingen argues that the report shows that additional work by Cherry Biometrics "will demonstrate conclusively that the theory and data on which the State's experts relied purportedly to place Swearingen near Trotter and trace his movement toward the crime scene is invalid, no longer accepted by experts in the field, and based on inadequate and inadmissible cell phone record[s]." (Doc. No. 49 at 21). Swearing hopes to show that:

- "Testimony and exhibit evidence that placed Mr. Swearingen at 2:02 and 2:09 PM" near the college "is false and misleading" because the tower's range "extends well to the south of FM 1960" disputing "[t]estimony that cell phone evidence meant it was 'not possible' for Mr. Swearingen to be at Cavender's Boot City on FM 1960 between 2:00 PM and 3:00 PM."
- "Testimony that purported to trace Mr. Swearingen's movements northward from the Community College towards the crime scene, based on the 2:02 and 2:09 PM calls being handled by the FM 1488 Tower and the 3:03 PM phone call being handle[d] by the Willis Tower, was also false and misleading. . . . Swearingen could have been driving south, not north, and anywhere within an area nearly a thousand square miles in size."
- "Testimony that at 3:03 PM on December 8, 1998, Swearingen had to have been traveling into the area corresponding to Sector 2 of Willis Tower represented on States Exhibit 63, and could not have been at this trailer home or parent's home, was false and misleading."

8

(Doc. No. 49 at 21). In short, Swearingen seeks funds to dispute the State's argument that, during the times between 2:00 and around 4:30 p.m., Swearingen took Ms. Trotter north to his home and then drove to the woods where he abandoned her body.[2]

Swearingen does not have any litigation pending in federal or state court. Swearingen does not ask for funds to support any anticipated federal litigation. Swearingen proposes that the requested funding will support a state habeas action he will file under Tex. Code Crim. Pro. art. 11.073. In 2013, Texas enacted Article 11.073 as a means by which a convicted person could obtain "relief on an application for a writ of habeas corpus" based on "relevant scientific evidence" that "was not available" and "contradicts scientific evidence relied on by the state at trial." The convicted person must show that, "had the scientific evidence been presented at trial, on the preponderance of the evidence the person would not have been convicted."[3] In short, the Texas courts under Article 11.073 require a "threefold showing" that (1) new, relevant scientific evidence is available that (2)

---

[2] Swearingen expects that expert assistance will disprove the time line of events shown in State's Exhibit 63, a map representing Swearingen's movements on December 8, 1998. (Doc. No. 49 at 21). Additionally, Swearingen argues that expert assistance can dispute "[t]estimony, and closing argument, purporting to trace Swearingen's movement from near the crime scene toward Willis, Texas, at or around 7PM on December 8, 1998 . . . ." (Doc. No. 49 at 21). Swearingen, however, does not point to any place in the record where the State focused its case on his movements that evening. Swearingen met his wife at around 4:30 p.m. Tr. Vol. 29 at 166, 182-83. The State did not argue that he then traveled back to the woods where he left Ms. Trotter's body. Swearingen does not mention that the phone call "around 7PM" was to his former girlfriend. Swearingen told her that he was in trouble and that the police might be after him. Tr. Vol. 25 at 230-31.

[3] Alternatively, Swearingen anticipates filing a successive state habeas application under Tex. Code Crim. Pro. art. 11.071 §5(a)(1) which allows the presentation of an "unavailable" claim showing "by a preponderance of the evidence," that "but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt . . . ." This Court's conclusions regard funds to support a claim under Article 11.073 apply with equal force to any potential claim under Article 11.071.

would be admissible and (3) would have, by a preponderance of the evidence, resulted in the person not being convicted. *Ex parte Kussmail*, 548 S.W.3d 606, 634 (Tex. Crim. App. 2018).

Federal courts do not generally fund investigations to support state habeas actions. Swearingen moves for this Court to fund his cell-phone-evidence challenge because Texas "does not provide funding for the investigation and development of subsequent habeas claims . . . ." (Doc. No. 49 at 2). Respondent objects to any allocation of funds. First, Respondent argues that "Supreme Court precedent precludes Swearingen's request here." (Doc. No. 51 at 2). Recognizing that the Supreme Court in *Harbison v. Bell*, 566 U.S. 180 (2009), authorized federally appointed attorneys to represent their clients in state clemency proceedings, Respondent contends that an Article 11.073 action is a " post-conviction state habeas proceeding for which . . . federal funds are not available." (Doc. No. 51 at 4). Because federal funds for expert assistance are only available for proceedings within the scope of the lawyer's appointment, *see Gary v. Warden*, 686 F.3d 1261, 1272 (11th Cir. 2012), Respondent argues that this Court should not approve any funds to support an Article 11.073 action. Second, Respondent argues that Swearingen cannot show that funds are reasonably necessary under 18 U.S.C. § 3599(f).

### III. Scope of Counsel's Appointment

Before addressing the substance of Swearingen's motion, he must show that any allocation of funds would support a proceeding within the scope of his attorney's representation. Federal law guarantees the appointment of counsel to inmates sentenced to death. *See* 18 U.S.C. § 3599(e). The relevant statute guarantees that an attorney will continue representing a death-row inmate

> throughout every subsequent stage of available judicial proceedings, including pretrial proceedings, trial, sentencing, motions for new trial, appeals, applications for writ of certiorari to the Supreme Court of the United States, and all available

> post-conviction process, together with applications for stays of execution and other appropriate motions and procedures, and shall also represent the defendant in such competency proceedings and proceedings for executive or other clemency as may be available to the defendant.

*Id.* The question before the Court is whether the scope of federal habeas counsel's representation includes a investigation into a possible successive habeas action under Article 11.073.

The parties extensively discuss the Supreme Court's interpretation of section 3599(e) in *Harbison v. Bell*, 556 U.S. 180 (2009). In *Harbison,* the Supreme Court specifically relied on the statutory language of section 3599(e) and found that federal law guarantees that appointed representation will continue in state clemency proceedings. Swearingen argues that the logic of *Harbison* obligates counsel to represent him in an Article 11.073 action.

While an attorney appointed under section 3599(e) is "authorized – and obligated – to continue representing the defendant until the court permits him to withdraw," *Wilkins v. Davis*, 832 F.3d 547, 558 (5th Cir. 2016), *Harbison* makes clear that the scope of that representation does not include every conceivable legal challenge. Under *Harbison*, only certain subsequent proceedings require the continued representation by federal counsel, and particularly those specifically mentioned in section 3599. The *Harbison* Court explicitly addressed whether section 3599(e) required federal counsel to litigate "any state habeas proceeding occurring after her appointment . . . ." 556 U.S. at 190. The Supreme Court stated that:

> subsection (e) authorizes counsel to represent her client in "subsequent" stages of available judicial proceedings. State habeas is not a stage "subsequent" to federal habeas. Just the opposite: Petitioners must exhaust their claims in state court before seeking federal habeas relief. *See* § 2254(b)(1). That state postconviction litigation sometimes follows the initiation of federal habeas because a petitioner has failed to exhaust does not change the order of proceedings contemplated by the statute.

*Id.*

Thus, *Harbison* links the promise of counsel in "subsequent" proceedings to the ordinary sequence in which habeas litigation follows. Litigation under Article 11.073 is not a subsequent stage of judicial proceedings in the general sequence of capital litigation. A successive habeas action under Article 11.073 may follow federal review, but does not ordinarily do so, and thus is not necessarily "subsequent" as contemplated by section 3599(e) or *Harbison*. Swearingen has not shown that an Article 11.073 is meaningfully different from a traditional state habeas proceeding which the Supreme Court found does not fall within section 3599(e)'s authorization.[4] Accordingly, the Court finds that federal law does not obligate counsel to represent, and be compensated for, all possible Article 11.073 actions brought in behalf of a death-row inmate. Thus, Sweaingen's request for funds would not support a proceeding for which counsel is obligated to represent his client.

## IV. <u>Reasonable Necessity</u>

*Harbison* stated that "a district court may determine on a case-by-case basis that it is appropriate for federal counsel to exhaust a claim in the course of her federal habeas representation." *Id.* at n.7. *Harbison* did not provide guidance as to what standards would authorize the federal appointment to extend outside the circumstances explicitly mentioned in section 3599(e). In light of the discussion that follows, however, the Court finds that Swearingen has not shown that

---

[4] Courts have found that various post-conviction proceedings do not fall within the scope of an attorney's representation under section 3599(f). *See Lugo v. Secretary, Fla. Dept. of Corrections*, 750 F.3d 1198, 1213 (11th Cir. 2014) ("[A] state prisoner is not entitled, as a matter of statutory right, to have federally paid counsel assist him in the pursuit and exhaustion of his state postconviction remedies."); *Crutsinger v. Davis*, 2017 WL 2418635, at *3 (N.D. Tex. 2017) (finding that *Harbison* did not authorize representation in a state action challenging DNA testing); *Gallegos v. Ryan*, 2017 WL 3822070, at *4 (D. Ariz. 2017) (finding that *Harbison* did not require representation in a state habeas action).

counsel's federal appointment should include his anticipated Article 11.073 action.

A federal court may authorize funds for investigative or expert services only on a showing that they are "reasonably necessary" for the inmate's representation. 18 U.S.C. § 3599(f). The Supreme Court has recently reiterated that "Congress has made it clear . . . that district courts have broad discretion in assessing requests for funding." *Ayestas v. Davis*, ___ U.S. ___, 138 S. Ct. 1080, 1094 (2018). In doing so, the Supreme Court cautioned that "§ 3599(f) cannot be read to guarantee that an applicant will have enough money to turn over every stone." *Id.* The Supreme Court has instructed that "[a] natural consideration informing the exercise of [the district court's] discretion is the likelihood that the contemplated services will help the applicant win relief." *Id.* Courts, therefore, must "consider the potential merits of the claims that the applicant wants to pursue, the likelihood that the services will generate useful and admissible evidence, and the prospect that the applicant will be able to clear any procedural hurdles standing in the way." *Id.*; *see also Jones v. Davis*, 922 F.3d 271, 283 (5th Cir. 2019); *Crutsinger v. Davis*, 898 F.3d 584, 586 (5th Cir. 2018). Meritless claims "cannot satisfy the *Ayestas* standard." *Robertson v. Davis*, 763 F. App'x 378 (5th Cir. 2019).

The showing Swearingen must make under Article 11.073 frames the question of whether expert service are reasonably necessary. Relief under Article 11.073 depends on showing that, with the new scientific evidence, "by a preponderance of the evidence that he or she would not have been convicted . . . ." *Ex parte Robbins*, 478 S.W.3d 678, 690 (Tex. Crim. App. 2014). This Court's review of Swearingen's motion for funding, viewed in the context of the entire record, does not demonstrate that the anticipated expert assistance could serve as the basis for a meritorious Article 11.073 action.

As an initial matter, Swearingen seeks funds to develop a claim under Article 11.073's habeas remedy for scientific evidence that was "not available at the time of trial." Swearingen's papers, however, do not specify when the scientific principles on which he would base his claims came into existence.[5] Funds are not reasonably necessary without a threshold showing an inmate can meet Article 11.073's requirement that the scientific evidence be "new."

Also, Swearingen lessens the credibility of his funding request by advancing arguments that conflict with his own trial testimony. Swearingen asks for funds to challenge the State's cell phone evidence showing that he lied in his police statement when he claimed to have been at Cavender's Boot City at 2:00 p.m. At trial, however, the State used a receipt to prove that Swearingen had actually been there in the morning. Swearingen admitted in cross-examination that he had lied in his police statement. Swearingen does not explain on what basis he now seeks to contradict his own trial testimony and resurrect the argument that he traveled south at 2:00 p.m. Swearingen's apparent attempt to dispute facts to which he admitted at trial detracts from the credibility of his request as a whole.

But, more importantly, the credibility of Swearingen's new arguments "depends on [their] relationship to the remainder of the evidence." (Doc. No. 36 at 36). In the Article 11.073 inquiry, the state courts would not look at the evidence in isolation to see if it disrupted portions of the State's

---

[5] The Fifth Circuit has previously found that federal courts accept historical cell-site tracking testimony similar to that given in the instant case. *See United States v. Schaffer*, 439 F.3d 344, 346-47 (5th Cir. 2011). It is unclear from the expert affidavit attached to Swearingen's motion whether he relies on new scientific evidence, or merely on long-standing disputes in the scientific community, about the reliability of such evidence. The affidavit indicates that Swearingen's expert has provided similar testimony in court since at least 2012 and that he relies on scientific standards in place since 2007. (Doc. No. 50 at 7-8, nn. 1-4). The expert's professional profile suggests that he has provided similar testimony since at least 2010. (Doc. No. 49, Exhibit 6).

time line, but would fit it into the entire landscape of trial. As this Court has observed, "[f]or the experts' opinions to be credible, clear, or convincing, they must conform to all the evidence. Scientific opinion provides the law with the most assistance when it accounts for the totality of the known facts." (Doc. No. 36 at 39). Throughout his post-conviction litigation, Swearingen has used expert testimony to advance tightly focused arguments that myopically examine minute features in an extremely dense factual record. Yet, "the credibility of Swearingen's experts" is best judged not in isolation, but "when their opinions are compared to all the facts." (Doc. No. 36 at 39).

Allegations about Swearingen's location based on his cell phone calls were not the crucial factors that sealed Swearingen's fate.[6] Swearingen's efforts to disrupt the time line, especially when it contradicts his own trial testimony, fails to account for the "mountain of inculpatory evidence" presented at trial. *Swearingen*, 478 S.W.3d at 722; *see also Swearingen*, 303 S.W.3d at 736. This Court's review of "the potential merits of the claims that [Swearingen] wants to pursue," *Ayestas*, 138 S. Ct. at 1094-95, results in a conclusion similar to that from his earlier challenge involving histological evidence:

> To reiterate, Swearingen was the last person that Ms. Trotter was seen with alive. Ms. Trotter had been in Swearingen's truck, where he forcibly removed hair follicles. Swearingen's histological evidence does not explain why she was in his house that day, why it was later found to be in disarray, and why he falsely claimed that there had been a burglary there. The evidence itself does not explain why papers belonging

---

[6] To be sure, cell phone evidence was important to the State's effort to set out a time line of events. The expert testimony Swearingen proposes raising broadens the area covered by the cell phone towers which recorded calls placed by Swearingen's cell phone on December 8, 1998. Swearingen's new argument allows for the possibility that he could have been somewhere else, but it does not necessarily mean the State was wrong about his movements that day. Still, during closing arguments the State described "the smoking gun, if you would, the irrefutable" evidence of guilt as being "a pair of pantyhose that's missing one leg found at [Swearingen's house] and positively matched as belonging to the leg used to strangle Melissa, found on her neck after her death." Tr. Vol. 34 at 82.

>to Ms. Trotter were found near the house of Swearingen's parents and her cigarettes were in Swearingen's house. The new information does not explain why Ms. Trotter was found wearing the same clothes as when she disappeared and why she had a note given to her by a friend on December 8 in her back pocket. . . . Histology does not explain why half of a pair of pantyhose belonging to Swearingen's wife was found in Swearingen's house and the other half around Ms. Trotter's neck. The new evidence does not explain why the same meal Ms. Trotter was last seen eating was found in her stomach. Swearingen lied about his whereabouts, tried to fabricate an alibi, made false police reports, fled from the police, asked friends to lie in his behalf, told others that the police would be after him, and crafted an ultimately inculpatory letter to throw attention away from himself. Swearingen told other inmates, "Fuck, yeah, I did it." Finally, Swearingen's experts do not explain where Ms. Trotter was from December 8 until a few days before hunters found her body.

(Doc. No. 36 at 42-43). Similar to his earlier challenge to histological evidence, Swearingen's latest proposed investigation does not call into question the "overwhelming evidence of [his] guilt." *Swearingen*, 303 S.W.3d at 736. Regardless of the time line, testimony proved that Ms. Trotter had been in Swearingen's truck and home. The evidence strongly showed that a violent struggle had occurred. Timing does not answer why a half of a pair of pantyhose was found in his house and the other half found around Ms. Trotter's neck in the woods. New arguments about cell phone evidence do not erase Swearingen's lies about, attempts to manufacture an alibi for, and ultimate inculpatory admission to, the murder.[7]

Simply, Swearingen has not shown that expert assistance in cell phone technology could aid in making a viable argument, by a preponderance of evidence, that the jury would not have convicted him had it considered his new evidence. The Court, therefore, finds that funding expert assistance relating to cell phone technology and tracking is not reasonably necessary. For those same reasons,

---

[7] In addition, Swearingen has not shown that federal procedure would countenance presenting the claim in any future federal action. Serious procedural hurdles, such as the Anti-Terrorism and Effective Death Penalty Act's limitations period and successive-petition prohibition, would preclude federal consideration of any claim based on the putative expert testimony.

the Court finds no basis under section 3599(e) to authorize counsel's representation in Swearingen's proposed Article 11.073 action. This denial is without prejudice. Should the facts and circumstances on either point change, Petitioner is free to make a new request with updated information.

## V. Conclusion

For the reasons stated above, the Court **DENIES WITHOUT PREJUDICE** Swearingen's Opposed Motion and Brief, Pursuant to 18 U.S.C. §3599(e), for Funding for an expert in Cell Phone Technology and Tracking. (Doc. No. 49).

The Clerk shall provide a copy of this order to the parties.

SIGNED at Houston, Texas this 12th day of June, 2019.

Andrew S. Hanen
United States District Court Judge